UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

ELISABETH EPPS,

      Plaintiff-Appellee,

v.

JONATHAN CHRISTIAN,

      Defendant-Appellant,

and

CITY AND COUNTY OF DENVER;
KEITH VALENTINE,

   Defendants.

Case No. 24-1371
(D.C. No. 1:20-CV-01878-RBJ)
(D. Colo.)

---

**OPENING BRIEF FROM APPELLANT JONATHAN CHRISTIAN**

---

**ORAL ARGUMENT IS REQUESTED**        December 18, 2024
**THIS DOCUMENT HAS BEEN CONVERTED TO NATIVE PDF**

Andrew D. Ringel, Esq.
Robert A. Weiner, Esq.
Hall & Evans, L.L.C.
1001 17th Street, Suite 300
Denver, Colorado 80202; (303) 628-3300
ringela@hallevans.com;weinerrhallevans.com

**ATTORNEYS FOR DEFENDANT-
APPELLANT JONATHAN CHRISTIAN**

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ...................................................................................iv

PRIOR OR RELATED APPEALS..........................................................................1

JURISDICTIONAL STATEMENT ........................................................................1

ISSUES ON APPEAL ............................................................................................1

SUMMARY OF ARGUMENT ..............................................................................2

STATEMENT OF CASE .......................................................................................3

STATEMENT OF FACTS .....................................................................................5

PROCEDURAL HISTORY....................................................................................8

ARGUMENT .......................................................................................................11

  I.  THE DISTRICT COURT ERRED BY DENYING OFFICER
      CHRISTIAN QUALIFIED IMMUNITY....................................................11

     A.  Preservation and Standard of Review .....................................................11

     B.  Qualified Immunity Principles.................................................................12

     C.  Officer Christian did not Violate Plaintiff's Constitutional Rights .........16

     D.  No Constitutional Right Violated by Officer Christian was Clearly
        Established ...............................................................................................20

  II.  THE CLAIMS AGAINST OFFICER CHRISTIAN SHOULD HAVE
       BEEN BIFURCATED FROM THE CLAIMS AGAINST DENVER..........33

     A.  Preservation and Standard of Review .....................................................33

B.  Bifurcation Legal Principles .................................................................34

C.  Officer Christian was Prejudiced by the District Court's Failure to
Order Separate Trials ..............................................................................35

III.  OFFICER CHRISTIAN WAS ENTITLED TO JUDGMENT AS A
MATTER OF LAW ON PUNITIVE DAMAGES......................................38

A.  Preservation and Standard of Review .....................................................38

B.  Standards for Punitive Damages .............................................................39

C.  Plaintiff Presented Insufficient Evidence to Support Punitive Damages
Against Officer Christian.........................................................................40

CONCLUSION .......................................................................................................41

STATEMENT REGARDING ORAL ARGUMENT .............................................41

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)..................................41

CERTIFICATE OF PRIVACY REDACTION .......................................................42

CERTIFICATE OF HARD COPY SUBMISSION ................................................42

CERTIFICATE OF DIGITAL SUBMISSION ......................................................42

ATTACHMENT A—Courtroom Minutes Trial Preparation Conference ..............52

ATTACHMENT B—Order on Denver Defendants' Motion for Summary
Judgment .........................................................................................54

ATTACHMENT C—Oral Motion and Ruling on Fed. R. Civ. P. 50 Motion ........71

ATTACHMENT D—Order on Motions for Judgment as a Matter of Law, New
Trial, or Remittitur as to Defendants Denver and Jonathan Christian ..........78

# TABLE OF AUTHORITIES

**Cases**                                                           **Page**

***A.M. ex rel. F.M. v. Holmes***, 830 F.3d 1123 (10th Cir. 2016) ............................ 15

***Adams v. City of Chicago***, 2012 U.S. Dist. LEXIS 158462
(N.D. Ill. Nov. 2, 2012) .................................................................. 37-38

***Angelo v. Armstrong World Indus.***, 11 F.3d 957 (10th Cir. 1993) ..................... 34

***Barrett Corp. v. YMC Royalty Co***. 918 F.3d 760 (10th Cir. 2019) ................. 11, 38

***Behrens v. Pelletier,*** 516 U.S. 299 (1996) ........................................................... 13

***Black Lives Matter D.C. v. Trump***, 544 F.Supp.3d 15 (D.C. 2021) .................... 32

***Buck v. City of Albuquerque***, 549 F.3d 1269 (10th Cir. 2008) .... 20, 21, 25, 27, 30

***Burke v. Regalado***, 935 F.3d 960 (10th Cir. 2019) .............................................. 12

***Chizmar v. Mackie***, 896 P.2d 196 (Alaska 1995) ................................................. 39

***Cillo v. City of Greenwood Vill.,*** 739 F.3d 451 (10th Cir. 2013) ......................... 13

***City of Escondido v. Emmons***, 586 U.S. 38 (2019) .............................................. 14

***City of Tahlequah v. Bond***, 595 U.S. 9 (2021) ............................................... 14, 31

***DeSpain v. Uphoff***, 264 F.3d 965 (10th Cir. 2001) .............................................. 25

***District of Columbia v. Wesby***, 138 S.Ct. 577 (2018) .......................................... 31

***Easton v. Boulder***, 776 F.2d 1441 (10th Cir. 1985) ............................................. 34

***Eisenhour v. Weber Cty.***, 897 F.3d 1272 (2018) .................................................. 39

***Elder v. Holloway***, 510 U.S. 510 (1994) ............................................................... 12

***Estate of George v. City of Rifle***, 85 F.4th 1300 (10th Cir. 2023) .................. 16, 17

***Estate of Taylor v. Salt Lake City***, 16 F.4th 744 (10th Cir. 2021) ....................... 13

***Fogarty v. Gallegos***, 523 F.3d 1147 (10th Cir. 2008) ................... 21, 22, 24, 28, 30

***Harlow v. Fitzgerald***, 457 U.S. 800 (1982) ............................................ 12

***Headwaters Forest Def. v. County of Humboldt***, 276 F.3d 1125
(9th Cir. 2002) ....................................................................................... 25

***Healy v. Cox Communs., Inc.***, 871 F.3d 1093 (10th Cir. 2017) .................... 11, 38

***Hernandez v. Wexford Health Sources, Inc.***, 2024 U.S. Dist. LEXIS 177965
(S.D. Ill. Sept. 30, 2024) ......................................................................... 37

***Holland v. Harrington***, 268 F.3d 1179 (10th Cir. 2001) ...................................... 33

***Kerns v. Bader***, 663 F.3d 1173 (10th Cir. 2011) ................................................... 14

***Keup v. Sarpy Cnty.***, 709 F.Supp.3d 770 (D. Neb. 2023) ............................... 31-32

***Kisela v. Hughes***, 138 S. Ct. 1148 (2018) ............................................................. 15

***Kolstad v. ADA***, 527 U.S. 526 (1999) ................................................................... 39

***Lantec, Inc. v. Novell, Inc.***, 306 F.3d 1003 (10th Cir. 2002) ......................... 11, 38

***Lund v. Henderson***, 807 F.3d 7 (1st Cir. 2015) .................................................... 35

***Martinez v. N.M. Dep't of Pub. Safety***, 47 Fed. Appx. 513 (10th Cir. 2002) ...... 25

***Mercardo v. City of Orlando***, 407 F.3d 1152 (11th Cir. 2005) ........................... 17

***Mitchell v. Forsyth***, 472 U.S. 511 (1985) ............................................................. 12

***Murphy v. Schaible***, 108 F.4th 1257 (10th Cir. 2024) .............................. 11-12, 38

v

***Park v. Shiflett***, 250 F.3d 843 (4th Cir. 2001) ....................................... 25

***Pearson v. Callahan***, 555 U.S. 223 (2009) ......................................... 13

***Perkins v. City of Des Moines***, 712 F.Supp.3d 1159 (S.D. Iowa 2024) .............. 32

***Plumhoff v. Rickard***, 572 U.S. 765 (2014) ......................................... 14

***Pueblo Neighborhood Health Ctrs. v. Losavio***, 847 F.2d 642 (10th Cir. 1988) .. 13

***Quinn v. Young***, 780 F.3d 998 (10th Cir. 2015) .................................... 15

***Ryan v. City of Salem***, 2017 U.S. Dist. LEXIS 85753 (D. Ore. June 5, 2017) .... 35

***Saucier v. Katz***, 533 U.S. 194 (2001) ............................................. 13, 33

***Saxion v. Titan-C-Mfg.***, 86 F.3d 553 (6th Cir. 1996) ............................. 34

***Surat v. Klamser***, 52 F.4th 1261 (10th Cir. 2022) ................................ 15

***Teel v. Lozada***, 99 F.4th 1273 (11th Cir. 2024) ................................... 17

***Thomas v. Kaven***, 765 F.3d 1183 (10th Cir. 2014) ................................ 13, 14

***Tolan v. Cotton***, 572 U.S. 650 (2014) ............................................. 14

***Vinyard v. Wilson***, 311 F.3d 1340 (11th Cir. 2002) ............................... 25

***White v. Pauly***, 137 S.Ct. 548 (2017) ............................................. 14

***Wilson v. Layne***, 526 U.S. 603 (1999) ............................................. 13

***Wilson v. Morgan***, 477 F.3d 326 (6th Cir. 2007) .................................. 35

***Workman v. Jordan***, 958 F.2d 332 (10th Cir. 1992) ....................... 12-13

**Statutes**

28 U.S.C. § 1291 ................................................................. 1

28 U.S.C. § 1331 ................................................................. 1

42 U.S.C. § 1983 ............................................... 1, 2, 3, 9, 35, 38

**Rules**

10th Cir. R. 25.5 ................................................................ 42

Fed. R. App. P. 32 ............................................................. 41

Fed. R. Civ. P. 42 ............................................................. 34

Fed. R. Civ. P. 50 ........................................ iii, 4, 9, 10, 11, 12, 21, 38

Fed. R. Civ. P. 59 ........................................................... 4, 10

## PRIOR OR RELATED APPEALS

This appeal is related to Case No. 24-1367. The appeals have been consolidated procedurally pursuant to this Court's October 9, 2024, Order.

## JURISDICTIONAL STATEMENT

Plaintiff-Appellee Elisabeth Epps ("Plaintiff" or "Ms. Epps"), with other Plaintiffs, filed this action in the United States District Court for the District of Colorado against Defendant-Appellee Jonathan Christian ("Officer Christian") and others pursuant to 42 U.S.C. § 1983 alleging violations of her First and Fourth Amendment rights. The District Court exercised federal question jurisdiction pursuant to 28 U.S.C. § 1331. Final judgment was entered by the District Court on August 19, 2024, and an Amended Final Judgment was entered by the District Court on August 29, 2024. Officer Christian filed his Notice of Appeal on September 16, 2024. This Court possesses appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES ON APPEAL

I.   DID THE DISTRICT COURT ERR IN DENYING OFFICER CHRISTIAN QUALIFIED IMMUNITY?

II.  DID THE DISTRICT COURT ERR IN DENYING BIFURCATION OR SEPARATE TRIALS OF THE CLAIMS AGAINST OFFICER CHRISTIAN FROM THE CLAIMS AGAINST THE CITY AND COUNTY OF DENVER?

III. DID THE DISTRICT COURT FAIL TO GRANT JUDGMENT AS A MATTER OF LAW ON THE ISSUE OF PUNITIVE DAMAGES?

## SUMMARY OF ARGUMENT

The District Court erred in three respects concerning Plaintiff's claims against Officer Christian.  First, the District Court erred in denying qualified immunity to Officer Christian from Plaintiff's remaining 42 U.S.C. § 1983 claim. The totality of the circumstances regarding Officer Christian's deploying a single PepperBall at Plaintiff while she was crossing the street through traffic towards the State Capitol grounds do not amount to a Fourth Amendment violation.  Further, the District Court erred in concluding the law was clearly established for qualified immunity purposes. Review and analysis of the two precedents from this Court relied upon by the District Court demonstrates they are not sufficiently factually analogous to the events involving Officer Christian and Plaintiff to create clearly established law in the particularized sense required by the Supreme Court and this Court's precedent.

Second, the District Court erred in denying separate trials of Plaintiff's claim against Officer Christian from all the Plaintiffs' claims against the City and County of Denver. Plaintiff's claim against Officer Christian included only the testimony of Plaintiff and Officer Christian and a handful of exhibits.  The totality of the trial consisted of dozens of witnesses, hundreds of exhibits and lasted three weeks. Plaintiffs presented a host of evidence of conduct by numerous Denver Police Officers not involving the Plaintiff or Officer Christian in an effort to prove their

municipal liability claims. The presentation of all of this evidence in the same trial as Plaintiff's single-incident claim against Officer Christian was prejudicial to Officer Christian because the jury could not help but evaluate his actions related to the Plaintiff in the context of all the other evidence they heard concerning the overall response to the protest.

Third, the District Court erred in failing to determine Plaintiff failed to meet the extremely high threshold for punitive damages against Officer Christian as a matter of law. The Supreme Court has held punitive damages may only be awarded in a 42 U.S.C. § 1983 case when the individual officer's conduct is shown to be motivated by evil motive or intent or when it involves the reckless or callous indifference to a plaintiff's federally protected rights. Here, Officer Christian's deployment of a single PepperBall at Plaintiff in an area saturation manner to change Plaintiff's conduct of crossing the street through traffic towards the State Capitol grounds does not meet the subjective intent necessary to support punitive damages.

## STATEMENT OF THE CASE

Plaintiff brought claims under the First Amendment and Fourth Amendment against Officer Christian pursuant to 42 U.S.C. § 1983 alleging he violated her constitutional rights while he worked as a police officer for the Denver Police Department based on his deployment of a PepperBall towards her on May 29, 2020,

during the extensive protest in the City and County of Denver following the death of George Floyd.

Officer Christian raised qualified immunity as a defense to Ms. Epps' claims. The District Court denied qualified immunity on summary judgment. The matter proceeded to trial. The District Court denied Officer Christian's Fed. R. Civ. P. 50 Motion for Judgment as a Matter of Law raising qualified immunity during trial. At the conclusion of trial, the jury found for Ms. Epps on her Fourth Amendment claim and for Officer Christian on her First Amendment claim. The jury awarded Ms. Epps $1,000,000.00 in compensatory damages against Officer Christian and Denver jointly and severally according to the interpretation of the verdict by the District Court, and punitive damages of $250,000.00 against Officer Christian.

Officer Christian filed a Motion for Judgment as a Matter of Law, or a New Trial, or Remittitur pursuant to Fed. R. Civ. P. 50(a) and Fed. R. Civ. P. 59(a). The Motion again raised qualified immunity. The District Court denied qualified immunity, denied Officer Christian's request for judgment as a matter of law and a new trial and denied a remittitur of the compensatory damages amount, but granted a remittitur reducing the punitive damages to $50,000.00. Ms. Epps accepted the remittitur of the punitive damages award.

Proceedings before the District Court continued related to other claims against other Defendants. Final judgment was entered by the District Court on August 19, 2024. Amended Final Judgment was entered by the District Court on August 29, 2024. Officer Christian filed his Notice of Appeal on September 16, 2024.

## STATEMENT OF FACTS

Following George Floyd's death on May 27, 2020, the Denver Police Department ("DPD") learned of possible protest activity in Downtown Denver. The afternoon of May 28, 2020, protestors mainly gathered near the State Capitol, but attempts were also made to overtake I-25 and the District 6 station. The first night, individuals associated with the protest engaged in criminal acts resulting in substantial property destruction and endangering public safety. Similarly, during the night of May 29, 2020, individuals associated with the protest also engaged in criminal acts directed at both property and police officers. As a result of these events, on May 30, 2024, the Mayor of the City and County of Denver declared a State of Local Disaster Emergency and issued an Emergency Curfew constating of a nighttime curfew imposed in all public places, streets, and right-of-ways. [App. Vol. 30, 183-84].

Officer Christian was a Denver Police Officer who was a member of the gang unit during the protest. [Tr. 1460:9-11 & 1460:23-24]. Officer Christian used a

PepperBall gun on some occasions during the protest. [Tr. 1462:4-6 & 1462:10-11]. Officer Christian was certified to use PepperBall. [Tr. 1463:6-12]. Officer Christian was trained to use PepperBall. [Tr. 1504:17-1505:20]. PepperBalls contain an OC powder which is an irritant. [Tr. 1463:13-15 & 1465:6-8].

The use of force incident involving Officer Christian and Ms. Epps occurred at approximately 9:00 p.m. on May 29, 2020, at the intersection of 14th and Lincoln on the South side of the State Capitol. Officer Christian was on the State Capitol grounds when he observed Ms. Epps crossing in the middle of the street through traffic. [Tr. 1475:15-1484:1; Tr. 1515:1-15; Exh. 108; Exh. 613; Exh. 1106].[1] Officer Christian testified he believes the reason the gang unit was deployed on the State Capitol grounds on May 29, 2020, was to move people away from the State Capitol and keep them from returning. [Tr. 1513:19-1514:16].

Officer Christian did not intend to hit Ms. Epps with the PepperBall. Rather, Officer Christian intended to deploy the PepperBall in an area saturation manner to encourage Ms. Epps to get out of the street. [Tr. 1515:1-1516:18]. Area saturation deploys the PepperBall on the ground so the chemical agent encourages a person or

---

[1] The video exhibits referenced in this Statement of Facts have been filed with this Court conventionally pursuant to this Court's Order dated December 16, 2024, granting the Unopposed Motion to Exempt Certain Record Materials from the Joint Appendix filed in Case No. 24-1367.

people to move from the area of the deployment. Officer Christian does not believe he hit Ms. Epps with the PepperBall. [Tr. 1485:20-22; Tr. 1517:7-9]. Based on his review of the video, Officer Christian believes the PepperBall hit the street. [Tr. 1517:12-20]. Ms. Epps testified she was struck with the PepperBall. [Tr. 1851:11-1852:3]. Officer Christian agrees the OC powder from the PepperBall may have gotten on Ms. Epps. [Tr. 1486:8-13].

Officer Christian described his perspective about what occurred during his trial testimony as follows:

A.      So, at that point, we had finally pushed everybody away, and I think in my body-worn camera footage, off to the right, you can kind of see the crowd moving along the street. We had a few break off, which was no problem, but I believe my mindset at the time was Ms. Epps had stepped into the roadway, and cars were honking and actually going around her.

And I remember watching, I believe it was two if not three vehicles honk their horns at her as they're going around her, before I had deployed the PepperBall at her in order to get her to move from the roadway. And after I deployed it, she still hadn't moved from the roadway. I then yelled for her to move from the roadway, at which point she did.

Q.      Okay. So, where were you aiming?

A.      I would have been—and I should go ahead and specify. I don't remember this incident, because I've been shown my body-worn camera. There was a lot that had happened that night. I don't have any independent knowledge of this. I can just kind of based off of—based off of who I am and my experiences, my information or my intent would have been to shoot at her feet.

Q. Okay. So, there is a concept related to deployment of PepperBall called area saturation; right?

A. Yes, sir.

Q. Describe what area saturation means.

A. Area saturation would include shooting an area with PepperBall in order for the powder, the chemical agent to disperse in order to get a person to move from one area to another area, a person or a group of people.

Q. What-were you employing area saturation with the PepperBall on May 29th, 2020, at approximately 9:00 p.m.?

A. Yes, sir.

Q. Okay. So, what were you trying to do is land the PepperBall by where this person's feet were to cause them to move?

A. Yes, sir.

Q. You weren't trying to target any part of the person's body?

A. No, sir.

[Tr. 1515:1-1516:18].

## **PROCEDURAL HISTORY**

Plaintiff Elisabeth Epps, and others, filed her Complaint and Jury Demand on June 25, 2020. [App. Vol. 1, 87-137]. A First Amended Complaint was filed on October 19, 2021. [App. Vol. 2, 2-60]. Plaintiff alleged Defendant Jonathan Christian violated her First and Fourth Amendment rights bringing claims pursuant

to 42 U.S.C. § 1983. [App. Vol. 2, 51-53]. Officer Christian answered on December 22, 2021.

On January 26, 2022, Officer Christian, with other Defendants, filed a Joint Motion to Bifurcate Trial. [App. Vol. 2, 235-54]. The District Court addressed bifurcation at the Trial Preparation Conference on February 4, 2022. [App. Vol. 5, 140-41; Attachment A; App. Vol. 14, at 1-16]. The District Court ordered separate trials on some claims related to some Defendants, but not the Plaintiff's claims against Officer Christian from all the Plaintiffs' claims against Denver. [App. Vol. 5, 140-41; Attachment A; App. Vol. 16, at 1-16].

On February 1, 2022, Officer Christian with the other Denver Defendants filed a Motion for Summary Judgment raising qualified immunity. [App. App. Vol. 5, 114-39]. The District Court denied summary judgment to Officer Christian including denying qualified immunity. [App. Vol. 11, 123-39; Attachment B].

Pursuant to Fed. R. Civ. P. 50, Officer Christian raised qualified immunity at the conclusion of Plaintiff's evidence. [Tr. 2118:7-2121:16; Attachment C]. The District Court denied Officer Christian's Rule 50 Motion and denied him qualified immunity. [Tr. 2135:2-8; Attachment C].

After a fifteen-day jury trial, the jury found for Ms. Epps on her Fourth Amendment claim and for Officer Christian on Ms. Epps' First Amendment claim.

[App. Vol. 11, 169-77]. The jury awarded Ms. Epps $1,000,000.00 in compensatory damages against Officer Christian and Denver jointly and severally according to the interpretation of the verdict by the District Court, and punitive damages of $250,000.00 against Officer Christian. [App. Vol. 11, 175-76].

Officer Christian filed a Motion for Judgment as a Matter of Law, or a New Trial, or Remittitur pursuant to Fed. R. Civ. P. 50(a) and Fed. R. Civ. P. 59(a) on May 13, 2022. [App. Vol. 11, 198-212)]. The Motion again raised qualified immunity. [App. Vol. 11, 201-2]. On September 19, 2022, the District Court denied qualified immunity, denied Officer Christian's request for judgment as a matter of law and a new trial and denied a remittitur of the compensatory damages amount, but granted a remittitur reducing the punitive damages to $50,000.00. [App. Vol. 12, 80-103; Attachment D]. Ms. Epps accepted the remittitur of the punitive damages award.

Proceedings before the District Court continued related to other claims against other Defendants. Amended Final judgment was entered by the District Court on August 19, 2024. [App. Vol. 12, 104-8)]. Officer Christian filed his Notice of Appeal on September 16, 2024. [App. Vol. 12, 112-14].

# ARGUMENT

## I.  THE DISTRICT COURT ERRED BY DENYING OFFICER CHRISTIAN QUALIFIED IMMUNITY

### A.  PRESERVATION AND STANDARD OF REVIEW

Officer Christian raised his entitlement to qualified immunity on summary judgment, pursuant to Fed. R. Civ. P. 50 at the close of Plaintiff's evidence, and pursuant to Fed. R. Civ. P. 50 in a post-verdict motion. [App. Vol. 5, 114-39; Tr. 2118:7-2121:16; Appl. Vol. 11, 198-212].

This Court reviews the District Court's denial of a Fed. R. Civ. P. 50 motion *de novo*. ***Healy v. Cox Communs., Inc.,*** 871 F.3d 1093, 1096 (10th Cir. 2017); ***Lantec, Inc. v. Novell, Inc.,*** 306 F.3d 1003, 1023 (10th Cir. 2002). "A party is entitled to judgment as a matter of law only if the court concludes that all of the evidence in the record reveals no legally sufficient evidentiary basis for a claim under the controlling law." ***Murphy v. Schaible,*** 108 F.4th 1257, 1264 (10th Cir. 2024) (quoting ***Barrett Corp. v. YMC Royalty Co.,*** 918 F.3d 760, 766 (10th Cir. 2019). However, the denial of qualified immunity in a Rule 50 motion is reviewed in the same fashion as other qualified immunity determinations. *See, e.g.,* ***Lam v. City of Los Banos,*** 976 F.3d 986, 996-1003 (9th Cir. 2020); ***Wiggington v. Jones,*** 964 F.3d 329, 334-339 (5th Cir. 2020); ***Dean v. Cnty. of Gage,*** 800 F.3d 945, 950-51 (8th Cir. 2015);

*Ciolino v. Gikas,* 861 F.3d 296, 302-6 (1ˢᵗ Cir. 2017); *Franco v. Gunsalus,* 2023 U.S. App. LEXIS 12641, at *7-8 (2d Cir. May 23, 2023); ²

## B. QUALIFIED IMMUNITY PRINCIPLES

The now-familiar doctrine of qualified immunity protects public officials, including police officers, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity is not only a defense against liability—but also immunity from suit. *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). It permits resolving claims against officials before subjecting them "'either to the costs of trial or to the burdens of broad-reaching discovery' in cases where the legal norms the officials are alleged to have violated were not clearly established at the time." *Id.* at 526. Its "central purpose" is to protect officials "from undue interference with their duties and from potentially disabling threats of liability." *Elder v. Holloway,* 510 U.S. 510, 514 (1994). It is both an entitlement not to stand trial, *Workman v. Jordan,*

---

² Counsel has located no decision from this Court reviewing a District Court's denial of qualified immunity under Fed. R. Civ. P. 50 and therefore cites to other Circuit precedent doing so. This Court has ruled the failure to raise qualified immunity in a Fed. R. Civ. P. 50 motion precludes its consideration on appeal despite it being raised on summary judgment. *See Burke v. Regalado,* 935 F.3d 960, 1001-3 (10ᵗʰ Cir. 2019) (following *Ortiz v. Jordan,* 562 U.S. 180, 183-84 (2011)).

958 F.2d 332, 336 (10th Cir. 1992), and a shield against trial-associated burdens, *Pueblo Neighborhood Health Ctrs. v. Losavio*, 847 F.2d 642, 645 (10th Cir. 1988).

When qualified immunity is raised, a presumption of immunity is created and the plaintiff must meet a strict two-part test showing: (1) the official's actions ran afoul of a federal constitutional right, and (2) the federal constitutional right was clearly established at the time of the allegedly unlawful actions. *Estate of Taylor v. Salt Lake City,* 16 F.4th 744, 757-58 (10th Cir. 2021); *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 460 (10th Cir. 2013). A court may address either prong first depending on the situation. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

On the first prong, the issue is whether the official's actions based on the evidence contained in the summary judgment record violated the constitutional right being asserted. *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996). On the second prong, the "clearly established" issue asks whether it would have been clear to the officials their conduct was unlawful in the situation confronting them. *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *see also Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014); *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (right "must be defined at the appropriate level of specificity").

More particularly on the second prong, the federal constitutional right asserted is "clearly established" only when a Supreme Court or Tenth Circuit decision "is on

point, or if the clearly established weight of authority from other courts shows the right must be as the plaintiff maintains." ***Thomas***, 765 F.3d at 1194. "While the facts of the cases compared need not be identical, they must be sufficiently analogous to satisfy the particularized context necessary to support liability." ***Id.*** The essence of this prong is "every reasonable official" must have received "fair warning" from the state of the law at the time as to the alleged conduct's unconstitutionality. ***Tolan v. Cotton***, 572 U.S. 650, 655-56 (2014) (per curiam); ***Kerns v. Bader***, 663 F.3d 1173, 1180 (10th Cir. 2011) (quoting ***Ashcroft v. al-Kidd***, 563 U.S. 731, 743 (2011)).

Even so, as the Supreme Court repeatedly reminds lower courts, "the law is not defined at a high level of generality," because "doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." ***Plumhoff v. Rickard***, 572 U.S. 765, 779 (2014); ***White v. Pauly,*** 137 S.Ct. 548, 551 (2017). "Such specificity is 'especially important in the Fourth Amendment context,' where it is 'sometimes difficult for an officer to determine how the relevant doctrine, here excessive force, will apply to the factual situation the officer confronts.'" ***City of Tahlequah v. Bond,*** 595 U.S. 9, 12-13 (2021) (quoting ***Mullenix v. Luna,*** 577 U.S. 7, 12 (2015)); ***City of Escondido v. Emmons,*** 586 U.S. 38, 42-43 (2019). "[E]xisting precedent" must place the constitutional

question the official faced "beyond debate." ***Kisela v. Hughes***, 138 S. Ct. 1148, 1153 (2018) (per curiam).

This Court has followed the Supreme Court's admonition not to too generally define the constitutional right at issue, particularly in the Fourth Amendment use of force context. *See, e.g.,* ***A.M. ex rel. F.M. v. Holmes,*** 830 F.3d 1123, 1135 (10th Cir. 2016) ("In that regard, we exercise special care to define the clearly established right at issue on the basis of the specific context of the case and, in so doing, avoid defining the case's context in a manner that imports genuinely disputed factual propositions."; citations and internal quotation marks omitted); ***Quinn v. Young,*** 780 F.3d 998, 1007 (10th Cir. 2015) ("Our qualified immunity conclusion is predicated upon the specific factual context of the Officers' conduct-a larceny sting operation-which presents a set of circumstances unique in itself under extant clearly established law."; citations and internal quotation marks omitted); ***Surat v. Klamser,*** 52 F.4th 1261, 1276 (10th Cir. 2022) ("But other binding precedent informs that the clearly established law must be particularized to the facts of the case. And plaintiffs may not identify their claim through extremely abstract rights because this would convert the rule of qualified immunity into a rule of virtually unqualified immunity."; citations and internal quotation marks omitted).

## C. OFFICER CHRISTIAN DID NOT VIOLATE
## PLAINTIFF'S CONSTITUTIONAL RIGHTS

This Court recently set forth the Fourth Amendment standard for excessive

force in the following terms:

> To establish a constitutional violation, the plaintiff must demonstrate the force used was objectively unreasonable. Under this standard, we carefully balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.

> We assess the reasonableness of an officer's use of force by applying the three nonexclusive factors first set forth by the Supreme Court in *Graham*. These include [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight. The *Graham* factors are nonexclusive and not dispositive; the inquiry remains focused on the totality of the circumstances.

> Our calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. So, we assess the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Our review looks at the facts and circumstances as they existed at the moment the force was used, while also taking into consideration the events leading up to that moment.

*Estate of George v. City of Rifle,* 85 F.4th 1300, 1315-16 (10th Cir. 2023) (citations

and internal quotation marks omitted and cleaned up).

Application of **Graham** demonstrates Officer Christian's use of force on Ms. Epps was reasonable under the totality of the circumstances. As a threshold matter, **Graham's** three factors are not readily applicable to these specific circumstances because Officer Christian's use of force was not an effort to arrest Ms. Epps or to seize her prior to arresting her. Rigidly applying the three factors to these circumstances results in a misguided attempt to force a square peg into a round hole. Importantly, however, these factors are neither exclusive nor dispositive and the focus remains on the totality of the circumstances faced by Officer Christian from his perspective, not the perspective of 20/20 hindsight. **George,** 85 F.4th at 1315-16. Courts have not rigidly applied the three **Graham** factors under inapplicable circumstances. *See, e.g.,* **Teel v. Lozada,** 99 F.4th 1273, 1283-4 (11th Cir. 2024) (discussing application of **Graham's** reasonableness and totality of circumstances inquiries in factual circumstances where the three factors do not readily apply); **Mercardo v. City of Orlando,** 407 F.3d 1152, 1157 (11th Cir. 2005) ("Because this situation does not involve a criminal arrest, our facts do not fit neatly within the **Graham** framework.").

Under a totality of the circumstance analysis, Officer Christian's deployment of a single PepperBall at Ms. Epps was reasonable and not a violation of her Fourth Amendment rights. On May 29, 2020, prior to his interaction with Ms. Epps, Officer

Christian had responded to the protest occurring all day. That night, Officer Christian and the gang unit were tasked with dispersing people congregating on the State Capitol grounds and had recently finished their effort. Part of their orders were to keep people from returning to the grounds. In that context, Officer Christian observed Ms. Epps walking across the middle of the street towards the State Capitol grounds, not in a cross-walk, through traffic with the vehicles repeatedly honking their horns at her. Faced with this situation, Officer Christian determined to deploy a single PepperBall which he aimed at Ms. Epps' feet in an area saturation maneuver to cause Ms. Epps to leave the street and not come onto the State Capitol grounds. Officer Christian used minimal force, did not attempt to strike Ms. Epps with the PepperBall, and the PepperBall used is designed not to injure a person but to expose them to OC for purposes of causing them to comply with police instructions. These circumstances from the perspective of Officer Christian do not demonstrate unreasonable actions or an improper use of force violative of Ms. Epps' Fourth Amendment rights.

Further, because the District Court discussed the ***Graham*** factors in its analysis, Officer Christian also does despite maintaining they are neither applicable nor useful to the analysis of these circumstances. Respecting the first ***Graham*** factor, Ms. Epps' illegal actions were jaywalking, obstructing traffic, and potentially failing

to follow the orders of the police by returning to the State Capitol grounds. Officer Christian recognizes these are misdemeanors and not particularly serious crimes. However, focusing solely on Ms. Epps' actions ignores what was generally occurring on May 29, 2020, at 9:00 p.m. in the State Capitol area which fails to engage in a totality of the circumstances analysis. Protestors and others were not following police orders and were engaged in assaultive and destructive behavior. No doubt Plaintiff will argue Ms. Epps did not engage in these things. While true, not analyzing whether a violation of the Fourth Amendment occurred by examining the overall factual context improperly ignores the applicable totality of the circumstances analysis.

Under the second *Graham* factor, while Ms. Epps' actions did not pose an immediate threat to Officer Christian or his fellow officers, her actions crossing the street in the middle of the block through traffic presented a safety risk to herself and the public. Under this factor, danger to others and not only the police is appropriately considered. Ms. Epps' actions posed a clear public danger. Officer Christian's minimal use of force—deploying a single PepperBall in an area saturation manner— does not represent an unreasonable or inappropriate response.

*Graham's* third factor has limited applicability here. Ms. Epps was not fleeing or attempting to evade arrest since Officer Christian was not trying to arrest her.

However, related to this factor is Officer Christian's and the gang unit's purpose of being on the State Capitol grounds. Their purpose was to remove people from the grounds and keep them off of the grounds. Ms. Epps' crossing the street towards the State Capitol grounds was inconsistent with the police's actions and is at least analogous conceptually to fleeing from an arresting officer.

In sum, under the proper totality of the circumstances analysis, Officer Christian's actions towards Ms. Epps on May 29, 2020, were reasonable and not violative of her Fourth Amendment rights regardless of how the inapplicable *Graham* factors might apply here.

### D. NO CONSTITUTIONAL RIGHT VIOLATED BY OFFICER CHRISTIAN WAS CLEARLY ESTABLISHED

Initially, the precedent relied upon by the District Court does not support the law being clearly established based on the totality of the circumstances Officer Christian faced when he deployed the PepperBall at Ms. Epps.

In concluding the law was clearly established and denying Officer Christian's qualified immunity, the entirety of the District Court's summary judgment analysis was the following:

> The law was clearly established that an officer cannot shoot a protestor with pepperballs when the protestor is committing no crime more serious than a misdemeanor, not threatening anyone, and not attempting to flee. In *Buck v. City of Albuquerque,* 549 F.3d 1269 (10th Cir. 2008), the Tenth Circuit "ha[d] little difficulty in holding that the

law was clearly established at the time of the alleged infraction" with regard to a plaintiff shot with pepperballs when she "posed no threat and did not attempt to flee." *Id.* at 1291. The Tenth Circuit reached the same conclusion in ***Fogarty v. Gallegos,*** 523 F.3d 1147 (10th Cir. 2008), where it held that because it was clearly established that "force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest," a reasonable officer would have been on notice that deploying less-lethal munitions against such an individual violated the law. *Id.* at 1161. Ms. Epps's allegation is that she posed no threat and was not attempting to flee, but she was shot by a pepperball nonetheless. It was clearly established that such a use of force is illegal, and qualified immunity is thus denied.

[App. Vol. 11, 138-39; Attachment B].

In its ruling denying the Rule 50 motion at the close of Plaintiff's evidence, the District Court denied Officer Christian's Motion with respect to the claims of Ms. Epps, but did not engage in any analysis of the clearly established prong. [Tr. 2135:2-8; Tr. 2145:24-2147:18; Attachment C].

In denying Officer Christian qualified immunity raised in his post-verdict Rule 50 Motion, the District Court reasoned:

> I agree with plaintiffs for largely the same reasons I identified in my order on Denver's motion or summary judgment. *See* ECF No. 304 at 15-16. In ***Buck v. City of Albuquerque,*** 549 F.3d 1269, 1290 (10th Cir. 2008), plaintiffs engaging in peaceful protest were subjected to tear gas and PepperBall shots. Ms. Epps behavior was even less likely than the plaintiffs in ***Buck*** to cause any danger from others. While some plaintiffs in ***Buck*** remained in the street to obstruct traffic, Ms. Epps was in the process of crossing the street when Mr. Christian shot at her, with no indication that she was going to stop in the street or was attempting to obstruct traffic. *See id.*; ECF No. 352, at 199. The illegality of actions like Mr. Christian have been specifically outlined

in past Tenth Circuit cases, and he is not entitled to judgment as a matter of law or a new trial on this issue.

[App. Vol 12, 96; Attachment D].

The District Court relied on two cases decided by this Court in concluding the law was clearly established. Examination of each of those cases demonstrates important factual and legal distinctions between them and this case rendering them insufficient to create clearly established law for qualified immunity purposes in the requisite specific and particularized manner required by Supreme Court precedent.

(1) ***Fogarty v. Gallegos,*** 523 F.3d 1147 (10th Cir. 2008). In ***Fogarty,*** this Court addressed a protest in March 2003 related to the invasion of Iraq near the University of New Mexico campus. This Court described the context of the protest and the plaintiff's activities as follows:

> At the protest's peak, between 500 and 1000 individuals were present, spilling over onto Albuquerque city sidewalks fronting UNM and eventually filling the crosswalks of adjacent streets. According to APD, the protestors' occupation of crosswalks effectively blocked all traffic on Central Avenue, the street running pat the bookstore. To ensure the crowd's safety, APD closed the street just east of the bookstore. After the street was closed, the crowd flooded into the rest of the street. The protestors then began moving west on Central Avenue. Eventually they encountered a police skirmish line blocking the avenue, at which point they turned around and began walking east, back toward the bookstore.
>
> As the crowd reversed direction, roughly an hour after the protesters first gathered, John Fogarty arrived at the bookstore to join the group. Fogarty, a physician and faculty member at UNM, was

accompanied by his wife, a friend, and his friend's fiancée. Fogarty observed that several streets had been closed and assumed that police were permitting demonstrators to march in the streets. Fogarty then joined the main group of marchers, which by now was four blocks away, heading back east toward the bookstore. According to Fogarty, the mood of the group at the time was "very peaceful," a characterization which defendants vehemently contest. Fogarty noticed that some protestors had formed a drum circle, and that several people were dancing and singing.

When the march reached the bookstore, Fogarty and his friend went back to his friend's car to collect their drums. After retrieving the instruments, Fogarty and his friend joined a drum circle of approximately ten protesters in the westbound lane of Central Avenue, in front of the bookstore. According to APD officers, the drummers were inciting the crowd and making it difficult to communicate, whereas Fogarty claims that they were "play[ing] a really nice samba" without being excessively loud; he played the drum with his hands, although many others used sticks. Fogarty stated that his drumming was his "personal way of expressing something through music," in this case, his opposition to the Iraq war. He remained with the other drummers for approximately 20 minutes, drumming intermittently during that time.

While the crowd was gathered around the bookstore, police made announcements over the loudspeaker system ordering protesters to either disperse or return to UNM property. Fogarty testified that he could not understand these "garbled and unintelligible" warnings, and it is undisputed that APD never ordered the drummers to stop playing. Evidence presented to the district court indicated that this communication problem may have been due to the noise of the drumming, a malfunctioning speaker system, or the failure of some police sirens to shut down prior to the announcement.

APD officers followed the warnings by deploying tear gas. After the first volley of gas, Fogarty moved onto the steps of the UNM bookstore because he "was there for a peaceful demonstration" and wanted to avoid the tear gas. According to Fogarty, this was the first

time he understood that APD wanted the protesters out of the streets. Police then repeated the order to clear the streets and move on to UNM property, which Fogarty reported hearing. Most people complied, but a handful of demonstrators remained in the streets.

At some point during these events, John Gonzales ordered APD forces to "remove the drums." Gonzales claims that this order meant that officers should first try to stop the drumming and then arrest the drummers only if necessary, but subordinate officers testified that they understood the statement as a direct order to arrest the drummers. In response to Gonzales' order, police teams moved in and arrested some of the drummers who remained in the street, but not Fogarty, who had already left the street.

While he was standing on the UNM campus, Fogarty alleges that an APD officer shot him with some sort of projectile, perhaps a "pepper ball" or some other variety of "less lethal munition." The police also deployed a second volley of tear gas, but from his location on the bookstore steps, Fogarty was only minimally affected by the gas.

Four to five APD officers then approached Fogarty as he knelt on the steps. Fogarty does not remember if he was drumming at the time. The officers, whom Fogarty cannot positively identify, picked him up and began leading him down the steps. Fogarty had difficulty walking because the drum was attached to his belt. As officers took him toward the street and closer to the tear gas, Fogarty, who has asthma, suffered an "acute broncospasm" that rendered him unable to walk further. Officers then forced Fogarty to the ground, pulling his arms behind his back and forcing the palm of his hand toward his forearm in a "hyperflexion position." They handcuffed him, ripped the drum off his belt, and dragged him down the street. Eventually realizing that Fogarty was having an asthma attack, officers stopped to allow him to catch his breath.

*Id.* at 1151-52. Utilizing these facts, this Court concluded the police actions violated

clearly established law, reasoning:

With respect to the use of pepper balls and tear gas, we acknowledge that our precedential opinions have not directly addressed the Fourth Amendment implications of what defendants call "less lethal" munitions. Nevertheless, a reasonable officer would have been on notice that the *Graham* inquiry applies to the use of these methods just as with any other type of pain-inflicting compliance technique. We find it persuasive that, in prior cases, we have assumed that the use of mace and pepper spray could constitute excessive force. *See DeSpain v. Uphoff*, 264 F.3d 965, 978 (10th Cir. 2001) ("[P]epper spray . . . implicates the excessive use of force" in the Eighth Amendment context.); *Martinez v. N.M. Dep't of Pub. Safety*, 47 Fed. Appx. 513, 516-17 (10th Cir. 2002) (unpublished) (citing *LaLonde v. County of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000)) (holding that a reasonable officer would have known that the use of mace against an arrestee who "posed no threat" and "was no risk of flight" amounted to excessive force); *accord Vinyard v. Wilson*, 311 F.3d 1340, 1355 (11th Cir. 2002); *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002); *Park v. Shiflett*, 250 F.3d 843, 853 (4th Cir. 2001). Considering that under Fogarty's version of events each of the *Graham* factors lines up in his favor, this case is not so close that our precedents would fail to portend the constitutional unreasonableness of defendants' alleged actions.

*Id.* at 1161-62.

(2) *Buck v. City of Albuquerque,* 549 F.3d 1269 (10th Cir. 2008). In *Buck,* this Court determined it "need not restate the background underlying the antiwar protest, as our related opinion in *Fogarty* [], has already done so." *Id.* at 1274 (citation omitted). However, as relevant here, this Court did describe the force used on the three plaintiffs in *Buck* as follows:

i. Ms. Chavez

As described by the district court, Aplts' App. Vol. VIII, at 1968-69, while standing near Central Avenue and Harvard Drive, Ms. Chavez saw an officer shoot a non-lethal round at the protestor next to her, causing the protestor to scream and fall down. She sat down in the street on Central Avenue near Cornell Drive as a sign of protest. She witnessed officers taking away other protestors in the crowd.

While seated in the street and not posing any threat, Ms. Chavez was subjected to tear gas and then shot repeatedly with pepper ball rounds. She saw officers deploy tear gas canisters into the crowd. She also witnessed the police shoot a second volley of tear gas cannisters into the area in front of the UNM Bookstore, which is where the officers had been directing protestors to go. Ms. Chavez felt that she could not move. The gas burned her eyes and she started choking. Because she was focused on regaining control of her breathing, Ms. Chavez does not recall feeling the impact of the pepper ball rounds on her body, nor did the projectiles leave any welts, marks, or bruises. She did, however, know that guns were pointed in her direction.

Ms. Chavez was aware of the possibility that she might be arrested for sitting in the street, but she did not expect to be subjected to tear gas or shot. Even after lying down to show that she was not a threat, she was repeatedly shot with pepper ball rounds. Other protestors eventually attempted to escort her to safety, but as they were doing so, an officer shoved Ms. Chavez from behind with his baton, knocking her down onto Central Avenue. She lay there, unable to stand, trying to breathe, coughing, her eyes burning. Once she could stand, other protestors helped her onto the sidewalk in front of the Frontier restaurant. Ms. Chavez leaned against a light pole, trying to recover, when more police officers yelling, screaming, and pushing with their batons, forced her back onto Central Avenue. She did not know what they wanted her to do, so she cried out to them to tell her where to go. They yelled back that she was to go across the street, and she complied.

. . . .

ii. Mr. Doyon

Our analysis as to Mr. Doyon is similar: faced with possible misdemeanor charges, he did not attempt to flee, or pose a threat to any officer or individual. The officers grabbed him, dragged him, and pushed him face down on the pavement. One officer kneed him in the back and pinned him to the ground. An officer pushed him face forward onto the roof of a police car, and he was exposed to tear gas while handcuffed in the car. . . .

iii. Mr. Kisner

Mr. Kisner did not resist arrest, attempt to flee, or pose a risk to an officer or anyone else. "A horse-mounted officer used his horse to repeatedly hit [him] in the face, about the head, and his chest." Aplt. App. Vol. VIII, at 2028. Another officer sprayed Mr. Kisner with pepper spray. When trying to retreat, horse-mounted officers pinned him between two horses, "kicked him in the back, shook him violently . . . by his shoulder strap of his backpack, and impelled him forward by releasing the strap." *Id.* The officers again approached him, and pulled him by the straps of his backpack, between the two horses, and pulled him up on his toes.

*Id.* at 1289-90. Based on these facts, this Court analyzed the clearly established

prong of the qualified immunity analysis, as follows:

We briefly turn to whether the specific facts the Excessive Force Plaintiffs presented demonstrate that Capt. Gonzales's conduct violated ***Graham's*** well-established parameters. We must disagree with Capt. Gonzales's characterization regarding the specificity of the right alleged. With regard to Ms. Chavez, she posed no threat and did not attempt to flee. With regard to Mr. Doyon and Mr. Kisner, not one of the suspected crimes charged or uncharged was severe, neither posed a threat to the safety of an officer or others, and neither attempted to flee or evade arrest. We have stated that ***Graham*** undoubtedly speaks to this right: "an officer's violation of the ***Graham*** reasonableness test is a violation of clearly established law if there are 'no substantial grounds

27

for a reasonable officer to conclude that there was legitimate justification' for acting as she did." *Casey,* 509 F.3d at 1286 (quoting *Holland,* 268 F.3d at 1197). As in *Casey,* "each factor in *Graham* counseled against the use of a large amount of force" against each of the Excessive Force Plaintiffs. *See Graham,* 490 U.S. at 396. Thus, we have little difficulty in holding that the law was clearly established at the time of the alleged infraction. *See Fogarty,* 523 F.3d at 1162 ("Considering that under [the plaintiff's] version of events each of the *Graham* factors lines up in his favor, this case is not so close that our precedents would fail to portend the constitutional unreasonableness of defendants' alleged actions.").

*Id.* at 1290-91.

Both *Fogarty* and *Buck* are legally and factually distinguishable. Initially, both decisions apply an incorrect legal framework for the clearly established qualified immunity inquiry. Instead of defining the constitutional right at issue with specificity and then examining whether clearly established law exists to place officers on notice their conduct violates the constitution before it occurs, the decisions improperly use *Graham* itself as the focus of their clearly established law analysis. Under current Supreme Court precedent, this analysis is wrong. *See* Section B *supra.*

Further, the facts from *Fogarty* and *Buck* are also distinguishable. Based on the facts outlined by this Court, the only plaintiffs in the two decisions whose situations are even potentially factually comparable are Mr. Fogarty and Ms. Chavez. However, the context of the uses of force with those two individuals and

the actual force used on them is not comparable to Officer Christian's use of force on Ms. Epps. Contextually, the facts of the anti-Iraq invasion protest in Albuquerque in 2003 and the George Floyd protest in Denver in 2020 differ significantly. Nothing in this Court's decisions describes any violence or destruction of property in Albuquerque. The Albuquerque protest was a single-day event, not a multi-day, multi-location event like in Denver. The protest in Albuquerque was in the day while the interaction between Ms. Epps and Officer Christian occurred at night. Officer Christian used force on Ms. Epps following a police operation to move protestors from the State Capitol grounds and prevent them from returning with Ms. Epps walking in the street towards the State Capitol and not engaging in any protest activity at the time while the force used on Mr. Fogarty and Ms. Chavez occurred during their protest activities. These are all distinguishing features between the two events.[3]

Similarly, the force used on Mr. Fogarty and Ms. Chavez differs from the force used by Officer Christian on Ms. Epps. The description of the total force used on Mr. Fogarty and Ms. Chavez as described above is markedly more force than the

---

[3] Plaintiff may argue her filming the police was a "protest activity." Assuming *arguendo* this conclusion is correct, Officer Christian did not observe Ms. Epps filming. [Tr. 1516:22-1517:6]. The jury's verdict in favor of Officer Christian on Plaintiff's First Amendment claim strongly suggests the jury credited this testimony.

single PepperBall Officer Christian fired at Ms. Epps. Evaluating all the force used in the entire encounter between the police and Mr. Fogarty and Ms. Chavez is the appropriate inquiry under the totality of the circumstances analysis required by *Graham*. This Court's conclusion it was clearly established the force used was unreasonable and unconstitutional is dependent on all the force used. Precedent does not support analysis of each separate use of force as establishing clearly established law for qualified immunity purpose; rather, the entire event—its totality of circumstances—must be analyzed. However, even considering only the use of less-lethal munitions, the facts involving Mr. Fogarty and Ms. Chavez are still distinguishable. Mr. Fogarty was exposed to tear gas once and it was deployed near him a second time, and he was struck by a PepperBall or another less-lethal munition. *Fogarty,* 523 F.3d at 1151-52. Ms. Chavez was repeatedly exposed to tear gas and shot with multiple PepperBalls while she was either sitting or lying down in the street. *Buck,* 549 F.3d at 1289. Factually, these cases are different than Officer Christian's use of force on Ms. Epps.

The two cases relied upon by the District Court as creating clearly established law do no such thing. Both of them are factually and legally distinguishable from Officer Christian's actions to Ms. Epps. The Supreme Court has repeatedly warned the lower courts to avoid casting the constitutional right at issue in too general terms

and also specifically determined it is critical in Fourth Amendment cases to analyze the issue based on the specific facts involved. Other than the fact ***Buck***, ***Fogarty***, and this case all involve police response to protests using less-lethal munitions, they are not sufficiently factually comparable to create clearly established law. Under the District Court's analytical framework, any police use of less-lethal munitions in a protest context unless active aggression or a specific threat to officer safety is involved will be considered clearly established. The Supreme Court's Fourth Amendment clearly established precedent precludes such a generalized approach to determining clearly established law. Instead, the actual facts of the earlier cases must be examined to determine if those facts specifically create clearly established law. *See, e.g.,* ***District of Columbia v. Wesby,*** 138 S.Ct. 577, 590 (2018) ("We have stressed the 'specificity' rule is 'especially important in the Fourth Amendment context.'"; citations omitted); ***Bond,*** 595 U.S. at 12-13 ("Such specificity is 'especially important in the Fourth Amendment context,' where it is 'sometimes difficult for an officer to determine how the relevant doctrine, here excessive force, will apply to the factual situation the officer confronts.'"; citations omitted).

Finally, other courts have applied qualified immunity to individual police officers in the context of the George Floyd protests further demonstrating the fundamental flaws of the District Court's approach here. *Compare* ***Keup v. Sarpy***

***Cnty.,*** 709 F.Supp.3d 770, 795-98 (D. Neb. 2023) (concluding use of PepperBall in an attempt to disperse rather than arrest was not a clearly established violation of the Fourth Amendment); ***Perkins v. City of Des Moines,*** 712 F.Supp.3d 1159, 1174-75 (S.D. Iowa 2024) (concluding striking an individual who was walking back and force in a street during a protest with a single less-lethal round was not a clearly established violation of the Fourth Amendment); ***Black Lives Matter D.C. v. Trump,*** 544 F.Supp.3d 15, 48-9 (D.C. 2021) (police effort to disperse crowd by using less-lethal munitions to move them another location not clearly established constitutional violation).

Alternatively, Officer Christian is entitled to qualified immunity because at most his deployment of PepperBall at Ms. Epps represents a reasonable mistake. Precedent allows officers to have qualified immunity when they make reasonable mistakes. This Court has previously explained:

> Qualified immunity operates in this case, then, just as it does in others, to protect officers from the sometimes hazy border between excessive and acceptable force and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful. It grants officers immunity for reasonable mistakes as to the legality of their actions, and in excessive force cases, in addition to the deference officers receive on the underlying constitutional claim, qualified immunity can apply in the event the mistaken belief was reasonable. Excessive force claims, like most other Fourth Amendment issues, are evaluated for objective reasonableness based on the information the officers had when the conduct occurred.

*Holland v. Harrington,* 268 F.3d 1179, 1196 (10th Cir. 2001) (citations and internal quotation marks omitted and cleaned up); *see also **Saucier,*** 533 U.S. at 205-6.

On May 29, 2020, Officer Christian deployed PepperBall at Ms. Epps while she was walking in the middle of the street towards the State Capitol grounds after police had dispersed people protesting there and were trying to prevent anyone from returning to the grounds. Officer Christian perceived Ms. Epps' actions as inconsistent with the police's effort, and also posing a safety risk to both herself and the passing traffic. Faced with these circumstances, Officer Christian deployed PepperBall in an area saturation method at Ms. Epps' feet to cause her to stop what he perceived to be her inappropriate actions. Even if this Court concludes Officer Christian's actions were inappropriate, they represent a reasonable mistake entitling him to qualified immunity.

## II. THE CLAIMS AGAINST OFFICER CHRISTIAN SHOULD HAVE BEEN BIFURCATED FROM THE CLAIMS AGAINST DENVER

### A. PRESERVATION AND STANDARD OF REVIEW

Officer Christian and other Defendants filed a Joint Motion to Bifurcate Trial requesting the claims against the individual Defendants be tried separately from the claims against the municipalities. [App. Vol. 2, 235-54]. While the District Court did order separate trials of the claims against other Defendants and an arrest class, the District Court denied a separate trial for Officer Christian. [App. Vol. 5, 140-41;

Attachment A]. Officer Christian raised his prejudice by the joint trial again in his Motion for Judgment as a Matter of Law, or a New Trial, or Remittitur. [App. Vol. 11, 198-212]. The District Court denied this aspect of Officer Christian's Motion. [App. Vol. 12, 80-103; Attachment D].

This Court reviews the District Court's decision not to order a separate trial of Plaintiff's claims against Officer Christian from the claims of Plaintiff and the other Plaintiffs against Denver pursuant to Fed. R. Civ. P. 42(b) for an abuse of discretion. *Angelo v. Armstrong World Indus.,* 11 F.3d 957, 964 (10th Cir. 1993); *Easton v. Boulder,* 776 F.2d 1441, 1447 (10th Cir. 1985).

## B. BIFURCATION LEGAL PRINCIPLES

Fed. R. Civ. P. 42(b) provides a District Court with the authority to order separate trials "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy. Fed. R. Civ. P. 42(b). Under this rule, a District Court may consider: convenience and economy; separability of the claim or issues; and fairness. *Angelo,* 11 F.3d at 964-65. The language of Rule 42(b) is disjunctive, meaning "[o]nly one of these criteria need be met to justify bifurcation." *Saxion v. Titan-C-Mfg.,* 86 F.3d 553, 556 (6th Cir. 1996) (citations omitted).

Courts recognize the benefit and necessity of holding separate trials in 42 U.S.C. § 1983 claims generally. *See, e.g., **Lund v. Henderson,*** 807 F.3d 7, 12 (1st Cir. 2015) (decision to hold separate trial for municipal claims subsequent to determination of individual liability "was a classic case of the trial court's management discretion."); ***Wilson v. Morgan,*** 477 F.3d 326, 340 (6th Cir. 2007) ("decision to bifurcate the trial was eminently reasonable in the interests of judicial economy and avoiding possible juror confusion."). More specifically, courts also recognize bifurcation of claims against an individual officer from claims against a municipality may be required to avoid prejudice to the individual officer based on evidence presented relevant to the municipal liability claim but not the individual claim. *See, e.g., **Ryan v. City of Salem,*** 2017 U.S. Dist. LEXIS 85753, at *5-6 (D. Ore. June 5, 2017) (recognizing separate trials as an option and cataloguing cases).

## C. OFFICER CHRISTIAN WAS PREJUDICED BY THE DISTRICT COURT'S FAILURE TO ORDER SEPARATE TRIALS

As the only individual Defendant at trial, Officer Christian was distinctly prejudiced by the combined trial of all Plaintiffs' claims against Denver. Of all the numerous witnesses testifying only two—Ms. Epps and Officer Christian—testified about what occurred on May 29, 2020, at 9:00 p.m. Neither of Plaintiffs' experts testified about Officer Christian or the event involving him and Plaintiff. Only a handful of exhibits related to the events involving Plaintiff and Officer Christian.

The vast majority of the testimony and documentary evidence presented a trial had nothing to do with Officer Christian or Plaintiff's claim against him. Review of the trial transcript in this matter reveals the May 29, 2020, incident only was discussed in part of Ms. Epps' and Officer Christian's testimony consisting of only 32 pages. [Tr. 1475:15-1486:25, 1513:19-1519:20, 1533:16-1536:1 (Christian); Tr. 1848:20-1853:20, 1903:11-1910:3 (Epps)]. This was only a small fraction of the overall presentation at trial. The spillover impact of all the other evidence was profound. Most particularly, the steady parade of video evidence involving other DPD officers and other people (both other Plaintiffs and others) and the allegation all those actions were caused by the failures of Denver itself was profoundly prejudicial to Officer Christian. Plaintiffs' expert, Norman Stamper, who was used to present most of the video evidence, did not mention Officer Christian, Ms. Epps or the May 29, 2020, event despite testifying for many hours. [Tr. 392:23-668:22]. None of his testimony and none of the videos presented during Mr. Stamper's testimony were relevant to the claims against Officer Christian and none of them would have been properly admitted in a trial properly focused on Plaintiff's claims against Officer Christian. Instead of focusing on the Plaintiff's claims against Officer Christian, the totality of the evidence presented the trial focused on other acts involving DPD, other Plaintiffs, the general public, and the customs, policies and procedures of Denver.

Moreover, Plaintiffs introduced other incidents during the protest involving Officer Christian which would likely not have been admitted in the absence of a joint trial. No review of the trial transcript and evidence presented as a whole supports any other conclusion than the trial was largely not about Plaintiff's claims against Officer Christian.

Officer Christian submits the evidence presented at trial was of the type and nature akin to those cases where federal courts have order bifurcation of individual and municipal liability claims. *Compare* ***Hernandez v. Wexford Health Sources, Inc.,*** 2024 U.S. Dist. LEXIS 177965, at *9 (S.D. Ill. Sept. 30, 2024) ("There is a real danger that such evidence could improperly influence the jury's consideration of the Individual Defendants' liability. A jury that hears evidence of systemic underqualification and underperformance by Wexford's healthcare providers may very well assume that such evidence impugns the integrity of the Individual Defendants and their treatment decisions *with respect to Alex*. The risk of liability by association alone is real in a case where the evidence may show widespread misconduct by and within an entity that employs the Individual Defendants."); ***Adams v. City of Chicago,*** 2012 U.S. Dist. LEXIS 158462, at *9 (N.D. Ill. Nov. 2, 2012) ("However, the nature of the widespread allegations of corruption involving the City and its SOS Officers is precisely the reason that the individual Defendant

officers may be prejudiced. . . . The possibility of overwhelming the jury and thereby prejudicing those individual Officers by trying the complex *Monell* claim at the same time is therefore great, and accordingly substantiates the City's request to bifurcate.").

### III. OFFICER CHRISTIAN WAS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PUNITIVE DAMAGES

#### A. PRESERVATION AND STANDARD OF REVIEW

Officer Christian moved at the close of the Plaintiff's evidence pursuant to Fed. R. Civ. P. 50 on whether Plaintiff met her burden of establishing a triable issue on punitive damages. [Tr. 2118:5-2121:16; Attachment C]. The District Court denied this Motion. [Tr. 2135:2-8; Attachment C]. Officer Christian again raised this issue in his Motion for Judgment as a Matter of Law, or a New Trial, or Remittitur. [App. Vol. 11, 198-212]. The District Court denied this aspect of his Motion. [App. Vol. 12, 80-103; Attachment D].

Denials of Fed. R. Civ. P. 50 motions are reviewed *de novo*. *Healy* 871 F.3d at 1096; *Lantec,* 306 F.3d at 1023. Judgment as a matter of law on an issue is appropriate if the evidence in the record is not legally sufficient under applicable law. *Murphy,* 108 F.4th at 1264; *Barrett Corp.,* 918 F.3d at 766.

## B. STANDARD FOR PUNITIVE DAMAGES

In *Smith v. Wade,* the Supreme Court held punitive damages may only be awarded in a 42 U.S.C. § 1983 case when an individual's "conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* The focus of whether punitive damages are appropriate is an analysis of the defendant's intent and state of mind. "It is the defendant's mental state, not the scope of the harm, that counts." *Eisenhour v. Weber Cty.,* 897 F.3d 1272, 1281 (2018). In *Kolstad v. ADA,* 527 U.S. 526 (1999), the Supreme Court explained:

> Egregious misconduct is often associated with the award of punitive damages, but the reprehensible character of the conduct is not generally considered apart from the requisite state of mind. Conduct warranting punitive awards has been characterized as "egregious," for example, *because* of the defendant's mental state. . . .
>
> To be sure, egregious or outrageous acts may serve as evidence supporting an inference of the requisite "evil motive." "The allowance of exemplary damages depends upon the bad motive of the wrong-doer *as exhibited by his acts*." 1 Sedgwick, *supra,* at 529 (emphasis added); see also 2 Sutherland, *supra*, § 394, at 1101 ("The spirit which actuated the wrong-doer may doubtless be inferred from circumstances surrounding the parties and the transaction"); see, e.g., *Chizmar v. Mackie,* 896 P.2d 196, 209 (Alaska 1995) ("Where there is no evidence that gives rise to an inference of actual malice, the trial court need not, and indeed should not, submit the issue of punitive damages to the jury" (internal quotation marks omitted)); . . .

*Id.* at 538-39.

## C. PLAINTIFF PRESENTED INSUFFICIENT EVIDENCE TO SUPPORT PUNITIVE DAMAGES AGAINST OFFICER CHRISTIAN

Plaintiff failed to present sufficient evidence to support Officer Christian possessed the requisite intent to justify punitive damages. Here, Officer Christian's deployment of a single PepperBall at Plaintiff under the circumstances he did is insufficient to raise any inference of evil, reckless or callous intent, particularly based on Officer Christian's unrefuted testimony about what he did and why. Officer Christian testified when he encountered Plaintiff on May 29, 2020, at 9:00 p.m., the gang unit had recently completed moving people from the State Capitol grounds and had been directed to keep them from returning. Officer Christian testified he perceived Plaintiff's actions of crossing the street through traffic as a danger to herself and the automobiles in traffic and decided to deploy a single PepperBall in an area saturation manner at Plaintiff to modify her behavior. Officer Christian's description of what occurred provides no evidence of the subjective intent necessary to support punitive damages.

Moreover, Officer Christian's actions themselves also are insufficient to raise any inference to support punitive damages. Officer Christian's actions in and of themselves are not the type of actions legitimately raising an inference of sufficiently egregious conduct warranting punitive damages. Officer Christian deployed a single PepperBall. Officer Christian aimed for the area by Plaintiff's feet and according to

Plaintiff struck her lower leg. There was no repeated conduct by Officer Christian. There was no targeting of a vulnerable part of Plaintiff's body. There was nothing demonstrating an intent to injure Plaintiff. The evidence presented at trial was simply insufficient to meet the extremely high threshold necessary to support submitting punitive damages to the jury or supporting any award of punitive damages against Officer Christian as a matter of law.

## CONCLUSION

In conclusion, based on the foregoing arguments and authorities, Defendant-Appellant Jonathan Christian respectfully requests this Court reverse the District Court's denial of his qualified immunity, alternatively reverse the verdict against him based on the District Court's improper failure to order a separation trial of the claims against him, alternatively vacate the award of punitive damages, and enter all such additional relief as this Court deems just and proper.

## STATEMENT REGARDING ORAL ARGUMENT

Based on the complexity of the legal and factual issues presented in this appeal, oral argument would be helpful to this Court in evaluating the appeal.

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)

The undersigned hereby certifies this Opening Brief is proportionally spaced and is printed in the Times Roman Font with a point size 14 and contains 10,208

words.  I relied on my word processor (Microsoft Word) to obtain the count. This word count excludes those sections not appropriately included in the word count pursuant to Fed. R. App. P. 32(a)(7)(B)(iii).

## CERTIFICATE OF PRIVACY REDACTIONS

The undersigned hereby certifies this Opening Brief contains all required privacy redactions pursuant to 10th Cir. R. 25.5 (there are none).

## CERTIFICATE OF HARD COPY SUBMISSION

The undersigned hereby certifies the hard copies of this Opening Brief submitted to the Court are exact copies of the version submitted electronically.

## CERTIFICATION OF DIGITAL SUBMISSION

The undersigned hereby certifies that this document is submitted in Digital PDF and has been scanned for viruses with Sophos End Point Security (updated daily), and is free of viruses.

Respectfully submitted,


s/ *Andrew D. Ringel*
Andrew D. Ringel, Esq.
Robert A. Weiner, Esq.
Hall & Evans, L.L.C.
1001 17th Street, Suite 300, Denver, CO 80202
303-628-3300 /Fax: 303-628-3368
ringela@hallevans.com
weinerr@hallevans.com

**ATTORNEYS FOR DEFENDANT-APPELLANT JONATHAN CHRISTIAN**

## CERTIFICATE OF SERVICE (CM/ECF)

I HEREBY CERTIFY that on the 18th day of December, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record in this matter.

s/ *Elizabeth Miller*                .
Elizabeth Miller, Legal Assistant
Hall & Evans, L.L.C.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**JUDGE R. BROOKE JACKSON**

| | |
|---|---|
| Civil Action: 20-cv-01878-RBJ | Date: February 4, 2022 |
| Courtroom Deputy: Julie Dynes | Court Reporter: Sarah Mitchell |

| Parties | Counsel |
|---|---|
| ELISABETH EPPS et al. | *R. Reeves Anderson* |
| | *Matthew Douglas* |
| | *Timothy Macdonald* |
| | *Makeba Rutahindurwa* |
| | *Elizabeth Wang* |
| **Plaintiffs** | |
| **v.** | |
| CITY AND COUNTY OF DENVER et al. | *Hollie Birkholz* |
| | *Eric Butler* |
| | *Isabelle Evans* |
| | *David Goddard* |
| | *Katherine Hoffman* |
| | *Robert Huss* |
| | *Lindsay Jordan* |
| | *Heather Kuhlman* |
| | *Michael Lowe* |
| | *Peter Morales* |
| | *Andrew Ringel* |
| **Defendants** | |

---

**COURTROOM MINUTES**

---

**TELEPHONE DISCOVERY CONFERENCE**

Court in Session: 9:01 a.m.

Appearance of counsel.

Discussion held on [274] Aurora Defendants' Motion to Continue Trial.

**ATTACHMENT A**

**ORDERED:   [274] Aurora Defendants' Motion to Continue Trial is GRANTED.  Counsel is excused from the hearing.**

Discussion held on [251] Defendants' Joint Motion to Bifurcate Trial.

**ORDERED:   [251] Defendants' Joint Motion to Bifurcate Trial is GRANTED in part, as outlined on the record.**

Discussion held on current trial procedures.

**ORDERED:   The Court will seat eight jurors.**

Continued discussion on trial procedures and length of trial.

**ORDERED:   Additional Trial Preparation Conference set for February 23, 2022, at 9:00 a.m. to review updated jury instructions and remaining motions.**

Discussion held on disputed witnesses.

**ORDERED:   Plaintiffs are allowed to dispose the two witnesses disclosed on the last day of discovery, as outlined on the record.**

Discussion held on exhibits.

The Court will look at the motions *in limine* prior to the next conference date.

Discussion held on jury instructions.

**10:56 a.m.      Court in recess.**
**11:11 a.m.      Court in session.**

Discussion held on [267] Denver Defendants' Trial Brief.

Court in Recess:  12:03 p.m.          Hearing concluded.          Total time in Court:  02:47

**ATTACHMENT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge R. Brooke Jackson

Civil Action No. 1:20-cv-01878-RBJ *consolidated with 1:20-cv-01922-RBJ*

ELISABETH EPPS, et al.,

     Plaintiffs,

v.

CITY AND COUNTY OF DENVER, et. al.,

     Defendants.

---

ORDER ON DENVER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

This matter is before the Court on a motion for summary judgment filed by defendants City and County of Denver, Officer Jonathan Christian, and Officer Keith Valentine (Denver defendants). For the below reasons, that motion (ECF No. 271) is GRANTED IN PART and DENIED IN PART.

## I.    STANDARD OF REVIEW

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs.*, Inc., 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.* However, conclusory statements based merely

1

**ATTACHMENT B**

on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. Stated differently, the party must provide "significantly probative evidence" that would support a verdict in her favor. *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). "[T]he facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

## II.    BACKGROUND

This case is a consolidation of claims arising from police-protestor interactions during demonstrations following George Floyd's murder. The instant motion seeks summary judgement on all claims against the Denver defendants. The relevant claims fall into three categories. First are class action claims against the City and County of Denver. These claims

**ATTACHMENT B**

arise from an Emergency Curfew (curfew) imposed by the Mayor of Denver on May 30, 2020 after three days of protests. *See* ECF No. 271 at ¶¶15–20. The curfew, which was eventually extended through June 5, prohibited all persons from "using, standing, sitting, traveling or being present on any public street or in any public place," with a few limited exceptions,[1] from 8:00 p.m. until 5:00 a.m.[2] Plaintiffs, who were arrested and detained pursuant to the curfew but not charged with any other violations, brought a putative class action alleging that the curfew and its enforcement violated their First, Fourth, and Fourteenth Amendment rights. *See* ECF No. 219. The Court certified a class consisting of "[p]rotesters who (1) between May 30 and June 5, 2020; (2) were arrested for violation of D.R.M.C. 1-13 (emergency curfew) or D.R.M.C. 38-31(c) (failure to obey lawful order); (3) were not charged with any other violations; and (4) whose charges were dismissed." ECF No. 127.

The second category of claims seeks damages from the City and County of Denver for alleged policies that caused violations of plaintiffs' First, Fourth, and Fourteenth Amendment rights. These municipal liability claims—also called *Monell* claims after *Monell v. Department of Soc. Servs.*, 436 U.S. 658 (1978)—allege a slew of rights-violative policies and practices.[3]

---

[1] The curfew carved out exceptions for emergency personnel, individuals traveling directly to or from work or the airport, seeking exempt care, fleeing dangerous circumstances, or experiencing homelessness, and individuals granted special permission by the city council. ECF No. 255-13 at ¶2. It contained no exceptions for First Amendment activity. *See id.*

[2] From June 1–5, the curfew began at 9:00 p.m. ECF No. 255-14.

[3] The alleged policies and practices include, but are not limited to:

> [F]ailure to give audible dispersal orders before the use of force; indiscriminate and inappropriate use of chemical munitions such as tear gas; indiscriminate and inappropriate use of PepperBalls, including as a crowd control/dispersal measure or on anyone disrupting traffic and without warning, and inadequate training thereon; dangerous "kettling" tactics; inappropriate use of 40mm launchers and other projectiles, including authorized use based on any "articulatable" need, and inadequate training thereon; inappropriate use of pepper spray and inadequate training thereon; inappropriate use of flashbangs and Stinger grenades and failure to train thereon; failure to require officers to complete timely use-of-force reports,

**ATTACHMENT B**

Evidence for these policies and practices includes observations of their use during the protests and statements by Denver Police Department (DPD) personnel that all police actions taken during the protests were consistent with departmental policies. *See* ECF No. 286-7 at ¶13q.

The final category of claims alleges that two individual DPD officers, Jonathan Christian and Keith Valentine, violated plaintiff Elizabeth Epps's First, Fourth, and Fourteenth Amendment rights when they hit her with pepperballs. Ms. Epps alleges that Officer Christian shot her with pepperballs "without any warning or justification while she was documenting the protests and isolated on a public street." ECF No. 286 at p. 24. She alleges that Officer Valentine struck her with a pepperball when he improperly fired into a crowd. *Id.* Defendants argue that qualified immunity bars these claims. ECF No. 271 at pp. 23–25.

### III.   CLASS PLAINTIFFS

The class plaintiffs allege that defendants violated their First, Fourth, and Fourteenth Amendment rights by arresting and/or detaining them pursuant to the curfew. They argue that the curfew and its enforcement illegally infringed upon their right to freedom of expression, that their arrests for violating the curfew were unconstitutional seizures, and that defendants' allegedly selective enforcement of the curfew constituted an improper classification in violation of the Fourteenth Amendment Equal Protection Clause. Defendants respond that undisputed evidence shows that the curfew withstands constitutional scrutiny and, in any case, plaintiffs are not entitled to relief because arrests were made with probable cause.

---

which negatively impacted officer accountability; inadequate BWC activation during crowd-control situations and failure to train thereon; failure to discipline officers for the excessive use of force; and dictating the rules of engagement for mutual assistance agencies from outside jurisdictions while simultaneously allowing agencies to follow their own policies.

ECF No. 286 at pp. 16–17 (internal citations omitted).

**ATTACHMENT B**

A. **Defining the Curfew**

The parties' dispute the curfew's content and Denver's policies surrounding curfew enforcement. Because the curfew's restrictions determine the proper level of constitutional scrutiny to apply, this section reviews the record to define the curfew. I keep in mind that I must view the evidence in the light most favorable to the plaintiffs but need not accept conclusory or unsupported allegations. *See Allen*, 119 F.3d at 839; *Bones*, 366 F.3d at 875.

I start with the curfew's text. It prohibited "all persons" from "being present on any public street or in any public place," defined as any place accessible to the general public. ECF Nos. 255-13; 255-14. The curfew carved out exceptions for emergency personnel, travel to and from work, individuals experiencing homelessness, and others, but it did not include an exception for First Amendment activity. The curfew order noted that, after Mr. Floyd's murder, "a civil disturbance ha[d] occurred within the downtown and surrounding areas of the City and County of Denver" resulting in "significant and extensive damage to people and/or property," and that the risk of continuing injury and/or damage remained. *Id.*

Defendants describe a version of the curfew I will call the "neutral curfew." Defendants emphasize that the curfew's language did not limit its applicability to demonstrators or protestors. They claim that the curfew's content-neutral text starts and ends the inquiry into its content—it applied to all citizens regardless of their speech or actions. Defendants further argue that the city's curfew enforcement policies did not draw distinctions based on speech. They highlight one instance supposedly confirming the curfew's neutral application: three non-protestors were arrested in Cherry Creek after fleeing from officers. ECF No. 271 at p. 13. If the majority of individuals cited for curfew violating were protestors, argue defendants, that was only because protestors constituted a disproportionate share of curfew violators.

**ATTACHMENT B**

Plaintiffs describe a different curfew and different enforcement policies. I will call plaintiff's version the "protest-targeted curfew." According to plaintiffs, despite the curfew's neutral language, Denver's actual curfew was a targeted order prohibiting protestors—and only protestors—from accessing public places after dark. They support this allegation with text messages, emails, and testimony that they claim show that the curfew was understood not as a curfew but as a ban on protesting. *See* ECF Nos. 286-19; 286-20; 286-21. The most notable texts convey a message from Division Chief Thomas: the curfew "is only to be used in relation to protest activity," and officers may "not [] cite for curfew just for being out after 2100." Instead, an individual must be engaged in "protest-related behavior" to be cited for a curfew violation. ECF No. 286-20 at pp.1, 4. Plaintiffs say that a reasonable jury could conclude that the text messages reflect a citywide policy because, although Division Chief Thomas is not a final policymaker, his texts summarized directives from the Chief of Police and other final policymakers. The one instance of curfew enforcement against non-protestors, claim plaintiffs, could reasonably be interpreted as an outlier when compared with over 300 instances of curfew enforcement against protestors. Plaintiffs argue in the alternative that even if the evidence does not show that the curfew's content discriminated based on speech, it nonetheless shows that DPD had adopted a speech-based selective enforcement policy.

I conclude that both versions of the curfew are supported by the record. A reasonable jury could accept defendants' claim that the policy was a "neutral curfew," but it could also accept plaintiffs' "protest-targeted curfew" description or plaintiffs' claims of selective enforcement. Internal DPD communications, which a jury might find persuasive, support plaintiffs' story. Because I must construe all evidence in the light most favorable to plaintiffs at this stage, I will analyze whether the protest-targeted curfew passes constitutional scrutiny.

**ATTACHMENT B**

### B. <u>First Amendment Claims</u>

This Court applies a three-step inquiry to decide whether the government violated a plaintiff's First Amendment rights. *Verlo v. Martinez*, 820 F.3d 1113, 1128 (10th Cir. 2016). Plaintiff must first establish that his activities were protected by the First Amendment. *Id.* If they were, the Court must "identify whether the challenged restrictions impact a public or nonpublic forum, because that determination dictates the extent to which the government can restrict First Amendment activities within the forum." *Id.* Finally, the Court determines whether a policy is content-based or content-neutral and then applies the requisite standard of review to the government's proffered justification for prohibiting plaintiff's speech. *Id.*

The parties agree that plaintiffs engaged in protected First Amendment activity and that the curfew, by closing all public places, impacted traditional public fora. The appropriate standard of review depends on whether the curfew was content-based or content-neutral. Content-based speech restrictions "must satisfy strict scrutiny," meaning they must be "narrowly tailored to serve a compelling government interest." *Id.* at 1134 (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)). Narrow tailoring in the strict-scrutiny context requires that a policy be "the least restrictive means" of achieving the government's interest. *Id.* Content-neutral restrictions undergo less rigorous scrutiny. They are permissible if they "(a) serve a significant government interest; (b) are narrowly tailored to advance that interest; and (c) leave open ample alternative channels of communication." *Id.*

The protest-targeted curfew, which a reasonable jury could find was Denver's actual policy, would have been content-based because it applied only to those participating in what the DPD referred to as the George Floyd protests. *See Golan v. Gonzales*, 501 F.3d 1179, 1196 (10th Cir. 2007) ("Content-based restrictions on speech are those which suppress, disadvantage, or impose differential burdens upon speech because of its content." (internal quotations

7

**ATTACHMENT B**

omitted)).  Such a law is "presumptively unconstitutional." *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018).  I find that the protest-targeted curfew does not satisfy strict scrutiny because, although the government had a compelling interest in preventing "violent, destructive, and riotous behavior jeopardizing public and officer safety and significant property damage," ECF No. 271 at p. 9, the protest-targeted curfew was not "narrowly tailored."  For content-based restrictions, a policy is narrowly tailored "only if it is the least restrictive means of achieving the government's compelling objective." *Verlo*, 820 F.3d at 1134.  A court must analyze whether the government could have achieved the same compelling interest in a way that imposed a less onerous burden on speech. *Golan*, 501 F.3d at 1196.

I cannot conclude that the protest-targeted curfew was the least restrictive means of achieving the government's interest.  First, the government has not argued that its curfew was the least restrictive means—it argued only that the curfew survived First Amendment scrutiny if construed as a content-neutral restriction. *See* ECF No. 271 at pp. 9–10.  Moreover, it is plausible that the government could have achieved its aims while imposing a less onerous burden on speech.  The government identified disturbances "occurring Downtown" that "involved substantial destruction of property and endangered public safety." *Id.* at p. 10.  A geographically limited curfew, for example, might have fulfilled the governmental objective.  Had the government chosen to clear 16th Street Mall, other business districts, and pedestrian-trafficked areas after dark but permitted peaceful protests to continue somewhere like City Park the "Downtown" disturbances would have ceased, property damage might have been eliminated or substantially reduced, public safety might have been preserved, and the foundational right to freedom of expression might have been maintained.  The protest-targeted curfew therefore does not survive First Amendment scrutiny.

**ATTACHMENT B**

The neutral curfew, however, would survive First Amendment scrutiny.  It would have been content-neutral and thus permissible even if it were not the *least* restrictive or intrusive means of advancing the government's interest.  *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1224 (10th Cir. 2021).  The neutral curfew would have been narrowly tailored in the sense required for content-neutral restrictions and would have left open ample alternative channels for communications by allowing daytime protests.  As a result, to succeed on their First Amendment claim at trial, plaintiffs must prove that Denver's policy was a curfew for protestors but not for anyone else, the order's text notwithstanding.  I find that plaintiffs have presented sufficient evidence to potentially carry this burden at trial, and there therefore exists a genuine dispute of material fact about the content of Denver's curfew policy.

### C.  Fourteenth Amendment

Plaintiffs claim that Denver's curfew enforcement policies violated their rights under the Fourteenth Amendment Equal Protection clause.  For this claim, plaintiffs argue that even if the curfew was content-neutral, Denver adopted a policy of discriminatory enforcement that targeted protestors because of their speech.  *See* ECF No. 286 at pp. 20–21 (citing internal DPD text messages instructing officers to enforce the curfew only "in retaliation for protest activity").  Defendants dispute the existence of such a selective enforcement policy.  They argue that not all protestors were arrested, and there was at least one instance in which a non-protestor was arrested.  ECF No. 271 at p. 13.  I found above that a reasonable jury could conclude that Denver had adopted a speech-based discriminatory enforcement policy.  The only remaining question is whether this factual dispute is material.  In other words, would the discriminatory enforcement policy described by plaintiffs affect their right to relief under the Fourteenth Amendment?

Defendants represent that an Equal Protection Clause selective enforcement claim "requires establishing: (1) different treatment from others similarly situated; and (2) the differing

9

**ATTACHMENT B**

treatment was based on clearly impermissible or invidious grounds 'such as race, religion, or the desire to prevent the exercise of constitutional rights.'"  ECF No. 271 at p. 12 (quoting *United States v. Salazar*, 720 F.2d 1482, 1487 (10th Cir. 1983)).

The discriminatory enforcement policy described by plaintiffs would suffice for Fourteenth Amendment liability under defendants' standard.  Plaintiffs contend that protestors—who were arrested—were treated differently under Denver's enforcement policy than non-protestors.  They further contend that the differing treatment was due to exercise of a constitutional right to free expression—as DPD text messages put it, whether an individual was "actively engaged in protest activity."  ECF No. 286-20.  The enforcement policy described by plaintiffs would violate the Equal Protection Clause.  If, however, defendants are correct that Denver's policy did not enforce the curfew only against protestors, then the curfew would not have given rise to a claim under the Equal Protection Clause because there would be no speech-based disparate enforcement.  The question of whether Denver adopted a protest-targeted enforcement policy is thus a genuine dispute of material fact.

### D. <u>Fourth Amendment</u>

Defendants argue that, even if the curfew was unconstitutional, arrests for violating the curfew could not have violated plaintiffs' Fourth Amendment right against unreasonable search and seizure because the arrests were supported by probable cause.  ECF No. 271 at p. 14.  I agree.  Many courts have found that officers should be excused from liability under a statute they reasonably believed to be valid at the time of arrest.  *See, e.g.*, *Pierson v. Ray*, 386 U.S. 547, 555 (1967); *Roska v. Peterson*, 328 F.3d 1230, 1251 n. 29 (10th Cir. 2003); *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994); *Peterson Novelties, Inc. v. City of Berkley*, 672 N.W.2d 351, 363 (Mich. 2003).  Although these sources deal with officer liability, I find the underlying principle persuasive.  Because plaintiffs did not respond to this argument or provide

**ATTACHMENT B**

alternative authority, I find no genuine dispute of material fact and dismiss the Fourth

Amendment class action claims.

## IV.   *MONELL* CLAIMS

Plaintiffs' municipal liability claims against the City and County of Denver require (1) a

city policy or custom; and (2) a causal link "between the policy or custom and the injury

alleged." *Waller v. Denver*, 932 F.3d 1277, 1283–84 (10th Cir. 2019).  "A municipal policy or

custom may take the form of (1) 'a formal regulation or policy statement'; (2) an informal

custom 'amoun[ting] to  a widespread practice that, although not authorized by written law or

express municipal policy, is so permanent and well settled as to constitute a custom or usage

with the force of law'; (3) 'the decisions of employees with final policymaking authority'; (4)

'the ratification by such final policymakers of the decisions—and the basis for them—of

subordinates to whom authority was delegated . . .'; or (5) the 'failure to adequately train or

supervise employees, so long as that failure results from deliberate indifference[4] to the injuries

that may be caused.'" *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (2010) (quoting

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189–90 (10th Cir. 2010))

(citations omitted).

### A.  <u>Fourth Amendment Claims</u>

Plaintiffs claim that Denver's policies deprived them of their Fourth Amendment right to

freedom from unreasonable seizures.  Claims that police used excessive force during a seizure

are analyzed under the Fourth Amendment's reasonableness standard.[5]  *Graham v. Connor*, 490

---

[4] Deliberate indifference is required only for municipal liability based upon a failure to adequately train or supervise. *See City of Canton v. Harris*, 489 U.S. 378, 387 (1989).  Other claims require only the existence of a policy and causation.  *Waller*, 932 F.3d at 1283–84.

[5] Plaintiffs must show both that a "seizure" occurred and that the seizure was "unreasonable."  *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989).

**ATTACHMENT B**

U.S. 386, 395 (1989).  Defendants do not dispute that plaintiffs have sufficient evidence to sustain a Fourth Amendment claim; defendants argue only that the two *Monell* factors—policy and causation—are not met.

I find there is sufficient evidence for a jury to find in plaintiffs' favor on the Fourth Amendment *Monell* claim.  To prove the existence of a policy, plaintiffs present expert witness reports identifying numerous DPD policies and customs.  ECF Nos. 286-6 at ¶¶6–142, 286-7; *see also supra*, p. 3 n.3.  A jury could believe plaintiffs' experts.  Defendants' litigation posture establishes the second *Monell* element, causation, for purposes of the summary judgment motion. Defendants do not dispute that plaintiffs have sufficiently alleged a Fourth Amendment injury at the hands of individual officers, nor do they dispute plaintiffs' contention that all individual officers were following DPD policies to a "T."  If officer compliance with DPD policies led to violations of Fourth Amendment rights, then a reasonable jury could find a causal connection between the policies and the violations.

Defendants contest only the possibility of drawing a causal connection between three specific policies and plaintiffs' injuries.  They argue that Denver's allegedly failing to discipline officers for uses of force, permitting officers to deactivate body worn cameras, and not requiring officers to complete use of force reports cannot have caused plaintiffs' injuries because those actions and inactions happened after injuries had already occurred.  ECF No. 271 at pp. 22–23. Defendants misunderstand the application of plaintiffs' evidence.  Plaintiffs argue that Denver's failure to require use of force reports and body worn camera activation, a preexisting policy understood by officers before the protests, notified officers that they likely would not be held accountable for excessive uses of force and thus caused them to use excessive force.  Plaintiffs have presented sufficient evidence to support this causal claim.  *See* ECF No.286 at p. 8.

**ATTACHMENT B**

Defendants are correct that Denver's alleged failure to discipline officers cannot be said to have caused an injury, but plaintiffs do not seek to introduce evidence of the policy for this purpose. Plaintiffs present evidence of failure to discipline as proof that specific policies existed—at least one DPD officer testified that "if [a DPD officer] is not disciplined, that shows that they were acting within policy."  ECF No. 286-8 at p. 2.

### B.  <u>First Amendment Claims</u>

Plaintiffs' First Amendment retaliation claim requires proof of three elements: (1) constitutionally protected activity; (2) government conduct that chills the protected activity; and (3) motive.  *Worrell v. Henry*, 219 F.3d 1197, 1206 (10th Cir. 2000).  Defendants contest only the third element—they argue that plaintiffs cannot raise a genuine dispute of material fact on the question of whether defendants' activities were "substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct."  *Id.*  I disagree.  Plaintiffs argue that "[a] factual dispute exists as to whether officers' actions were motivated, at least in part, by [p]laintiffs' protected activity."  ECF No. 286 at p. 13.  Plaintiffs present evidence that they did not engage in destructive activity, and that many officers used force in situations that support an inference of retaliatory motive, such as tear gassing kneeling protestors chanting "Hands Up Don't Shoot" or shooting a plaintiff through her "Black Lives Matter" sign.  *Id.*  Denver's allegedly permissive policies regarding officers' use of less-lethal munitions could have caused retaliatory uses of force.  Defendants' contention that officer actions were motivated by a legitimate need to respond to violent protestors may be true, but that is for a jury to decide. Plaintiffs' First Amendment *Monell* claim survives summary judgment.

### C.  <u>Fourteenth Amendment Claims</u>

Although plaintiffs are permitted to bring excessive force claims under the Fourteenth Amendment Due Process clause for uses of force that do not fall under the Fourth Amendment's

## ATTACHMENT B

"searches and seizures" requirement, *Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003), plaintiffs' Fourteenth Amendment claims are no longer at issue.  Based on statements by counsel during the trial preparation conference held on February 23, 2022, this Court understands that plaintiffs pursued their Fourteenth Amendment claims only in case defendants argued that Denver's actions were not withing the Fourth Amendment's ambit because, regardless of the actions' unreasonableness, plaintiffs were not seized.  *See Brower*, 489 U.S. at 599 (stating that Fourth Amendment claim requires plaintiffs must show both that a "seizure" occurred, and that the seizure was "unreasonable").  Defendants represented that they would make no such argument—if the evidence shows that Denver and its employees' actions constituted unreasonable and/or excessive force, defendants will not seek to evade liability because the unreasonable and/or excessive force was not applied during the course of a seizure.  The Fourteenth Amendment claims are therefore moot.

## V.    INDIVIDUAL DEFENDANTS

Plaintiff Elizabeth Epps brings Fourth, Fourteenth,[6] and First Amendment claims against Officers Jonathan Christian and Keith Valentine in their individual capacities.  Ms. Epps claims that Officer Christian shot her with a pepperball while she was livestreaming video of the police.  ECF No. 286-35 at p.35.  According to Ms. Epps, Officer Christian shot her without warning or justification.  *See* ECF No. 178 at ¶ 95.  Ms. Epps claims that Officer Valentine shot her in the face with a pepperball the next day while she peacefully protested.  ECF No. 286-35 at p. 34.  Ms. Epps alleges that Officer Valentine fired in retaliation when a different protestor threw a water bottle, but he did not give any warnings and took no precautions to ensure that he would

---

[6] Like plaintiffs' Fourteenth Amendment *Monell* claims, Ms. Epps's Fourteenth Amendment claims against the individual officers are no longer contested for the purposes of trial.  *See supra* pp. 7–8.

## ATTACHMENT B

not injure innocent bystanders—Ms. Epps claims that Officer Valentine fired several rounds at face-level.  *See* ECF No. 178 at ¶ 97.

Defendants respond that Officers Christian and Valentine are entitled to qualified immunity.  ECF No. 271 at pp. 23–25.  "Qualified immunity balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  To avoid application of qualified immunity, a plaintiff must prove that (1) defendant violated a constitutional right, and (2) the constitutional right was clearly established at the time it was allegedly violated.  *Id.* at 232.  In arguing that the individual defendants are entitled to qualified immunity, defendants argue that no binding precedent "clearly established" that defendant officers' alleged conduct was unlawful. ECF No. 721 at pp. 23–24.  Defendants emphasize the "essence" of qualified immunity's second prong: to ensure that "every reasonable official" has received "fair warning" before being held liable.  *See id.* (quoting *Tolan v. Cotton*, 572 U.S. 650, 56 (2014)).

## A.  <u>Officer Christian</u>

I find that Officer Christian is not entitled to qualified immunity.  Ms. Epps stated at her deposition that she was walking slowly and filming the protests when a police officer, who she identifies as Officer Christian, shot her with a less-lethal munition.  ECF No. 286-35 at p. 27. Her cellphone video provides no reason to doubt her testimony—it shows her isolated and inoffensively crossing a street when an officer kneels and aims what appears to be a pepperball gun at her.  ECF No. 286-36 at 2:50–3:10. She then states, "he just shot me," and zooms in on the kneeling officer.  *Id.*

The law was clearly established that an officer cannot shoot a protestor with pepperballs when that protestor is committing no crime more serious than a misdemeanor, not threatening

15

**ATTACHMENT B**

anyone, and not attempting to flee.  In *Buck v. City of Albuquerque*, 549 F.3d 1269 (10th Cir. 2008), the Tenth Circuit "ha[d] little difficulty in holding that the law was clearly established at the time of the alleged infraction" with regard to a plaintiff shot with pepperballs when she "posed no threat and did not attempt to flee." *Id.* at 1291.  The Tenth Circuit reached the same conclusion in *Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008), where it held that because it was clearly established that "force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest," a reasonable officer would have been on notice that deploying less-lethal munitions against such an individual violated the law.  *Id.* at 1161.  Ms. Epps's allegation is that she posed no threat and was not attempting to flee, but she was shot by a pepperball nonetheless.  It was clearly established that such a use of force is illegal, and qualified immunity is thus denied.

Regarding Ms. Epps's First Amendment retaliation claim, "[i]t has long been clearly established that the First Amendment bars retaliation for protected speech and association." *Buck*, 549 F.3d at 1292 (quoting *Mimics, Inc. v. Vill. of Angel Fire*, 394 F.3d 836, 848 (10th Cir. 2005) (alteration in original).  Because Ms. Epps alleges she was doing nothing but filming the events and, through her presence, protesting police violence, I find a genuine dispute of material fact over whether Officer Christian shot Ms. Epps in retaliation for protected speech and association.

## B.  Officer Valentine

I cannot find that Officer Valentine's actions violated clearly established law.  Officer Valentine allegedly saw a protestor throw an object at the police, fired at the protestor, missed, and hit Ms. Epps, who was standing 10-15 feet behind the thrower.  *See* ECF No 286-6 at p.45.  Ms. Epps protests that Officer Valentine unnecessarily deployed pepperballs, did not warn protestors before firing, and aimed too high.  ECF No. 178 at ¶ 97.  The cases cited above

**ATTACHMENT B**

establish that pepperballs are inappropriate against non-threatening individuals.  I do not find

them applicable here where an individual threw objects at the police.  And plaintiffs have

provided no authority clearly establishing that it violates the constitution for an officer to fail to

give warning to those standing behind an aggressive individual before firing at that individual, or

that an officer violates the constitutional rights of those standing behind a threatening individual

by aiming too high and being a poor shot.  Officer Valentine is thus entitled to qualified

immunity.

## VI.    ORDER

For the above reasons, Denver's motion for summary judgment (ECF No. 271) is

GRANTED as to Officer Valentine, GRANTED as to the Fourth Amendment class action

claims, and DENIED as to all other claims and defendants.

DATED this 1st day of March, 2022.

BY THE COURT:

_____

R. Brooke Jackson
Senior United States District Judge

## ATTACHMENT B

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF COLORADO

3    Civil Action No. 20-cv-1878-RBJ

4    ELISABETH EPPS AND SARA FITOURI, ET AL.,

5          Plaintiffs,

6          vs.

7    CITY AND COUNTY OF DENVER, ET AL.,

8          Defendants.

9    ------------------------------------------------------------

10                     REPORTER'S TRANSCRIPT

11                     Jury Trial, Vol. 11

12   ------------------------------------------------------------

13          Proceedings before the HONORABLE R. BROOKE JACKSON,
     Judge, United States District Court for the District of
14   Colorado, commencing on the 21st day of March, 2022, in
     Courtroom A902, United States Courthouse, Denver, Colorado.

15

16                         APPEARANCES
     For the Plaintiffs:
17   TIMOTHY R. MACDONALD, MATTHEW J. DOUGLAS, and DIANA K. STERK,
     Arnold & Porter Kaye Scholer LLP, 1144 Fifteenth Street, Suite
18   3100, Denver, CO 80202

19   ELIZABETH C. WANG and MAKEBA RUTAHINDURWA, Loevy & Loevy, 2060
     Broadway Street, Suite 460, Boulder, CO 80302

20

21   For the Defendants:
     ANDREW D. RINGEL, KATHERINE HOFFMAN, and ROBERT A. WEINER, Hall
22   & Evans LLC, 1001 Seventeenth Street, Suite 300, Denver, CO
     80202

23

     HOLLIE R. BIRKHOLZ and LINDSAY M. JORDAN, Denver City Attorney's
24   Office, 201 West Colfax Avenue, Denver, CO 80202

25   Reported By KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room
     A259, Denver, CO 80294, (303)335-2358

**ATTACHMENT C**

20-cv-1878-RBJ    Jury Trial    03-21-2022

1                         I N D E X

2  PLAINTIFFS' WITNESSES                                PAGE

3  EDWARD MAGUIRE, PhD
        Cross Examination By Mr. Ringel . . . . . . . . 2087
4       Redirect Examination By Ms. Sterk . . . . . . . 2113

5

6  PLAINTIFFS' EXHIBITS:

7
                          Identified              Received
8

9      141                2223                    2223
       509                2225                    2225
10     581                2197                    2197
       582                2239                    2239
11     606                2256                    2256
       1265               2245                    2245
12     1266               2301                    2302

13  DEFENDANTS' WITNESSES                               PAGE

14  MICHAEL O'DONNELL
        Direct Examination By Ms. Hoffman . . . . . . . 2149
15      Cross Examination By Mr. Douglas . . . . . . . . 2235
        Redirect Examination By Ms. Hoffman . . . . . . 2285
16
    THOMAS PINE
17      Direct Examination By Ms. Birkholz . . . . . . . 2293

18

19  DEFENDANTS' EXHIBITS:

20                        Identified              Received

21     3056               2207                    2207
       3096               2198                    2198
22     3103               2216                    2216
       3137               2217                    2217
23     3152               2233

24

25  Reporter's Certificate . . . . . . . . . . . . . . . 2303

**ATTACHMENT C**
Kevin P. Carlin, RMR, CRR

1  ladies and gentlemen, so we're going to have a little bit of an

2  early break for you.  We will come for you as soon as we're

3  ready.

4       (Jury out at 9:46 a.m.)

5            THE COURT:  The jury has been excused.  Mr. Ringel, do

6  you wish to make a motion?

7            MR. RINGEL:  I do, Your Honor.  Thank you.  At this

8  time, on behalf of the defendants the City and County of Denver

9  and Jonathan Christian, I move for judgment as a matter of law

10  on the following issues pursuant to Federal Rules of Procedure

11  50.  Initially, I incorporate all of the arguments and

12  authorities made in the Denver defendants' motion for summary

13  judgment and the applicable arguments in the trial brief and the

14  second trial brief.

15            The first issue I would like to raise, Your Honor, is

16  related to the claims involving plaintiff Cidney Fisk.  As the

17  Court knows, Ms. Fisk was previously represented by counsel for

18  the Epps plaintiffs.  She became pro se.  She has not appeared

19  in this matter in quite some time.  She has failed to appear at

20  trial, and offered no evidence to support her claims.  Because

21  no evidence has presented, it is our view that the defendants

22  are entitled to judgment as a matter of law related to Ms. Fisk.

23            THE COURT:  Is there any objection to that from

24  anybody?

25            MS. STERK:  We have no position on that, Your Honor.

**ATTACHMENT C**
Kevin P. Carlin, RMR, CRR

1          THE COURT:  Winner, winner, chicken dinner.

2          MR. RINGEL:  I thought I would start with the easy

3   one, Your Honor.

4          THE COURT:  All right.  Your claim by Ms. Fisk is

5   dismissed for failure to prosecute.

6          MR. RINGEL:  All right.  Moving on, Your Honor.

7          THE COURT:  It has to be without prejudice.  Any

8   failure to prosecute is without prejudice, but --

9          MR. RINGEL:  Well, but shouldn't it be a dismissal

10  under Rule 50 for failure to present evidence?

11         THE COURT:  Good question.  You're probably right.

12         MR. RINGEL:  And that would be with prejudice under

13  Rule 50.

14         THE COURT:  You're right.  I agree.

15         MR. RINGEL:  Okay.  Moving on, I want to address the

16  claims of plaintiff Elisabeth Epps against Jonathan Christian.

17  The first of those claims is a First amendment retaliation

18  claim.  It is our position that Ms. Epps can't meet the

19  subjective intent requirement for a claim under *Worrell versus*

20  *Henry* for the causation claim aspect of the claim based on the

21  Tenth Circuit's decision that it has to be but for.

22          So, the issue here is whether Mr. Christian's firing of

23  a single PepperBall in the direction of Ms. Epps was

24  substantially motivated in our version of *Worrell*, or

25  substantial or motivated in the version from the plaintiffs for

1  her exercise of protected activity under the First amendment.

2          It is our view that there is not sufficient evidence in

3  the record of that subjective motivation by Mr. Christian.

4  There is not evidence that he specifically fired the PepperBall

5  because of any First amendment activity that Ms. Epps was

6  engaged in at that moment.  He said that he didn't know that she

7  was filming anything, and that he fired the PepperBall for the

8  purpose of being -- because she was in the street and to get her

9  out of the street.

10         And one can argue about the legitimacy of that, and we

11 will in a minute with respect to the Fourth amendment claim, but

12 I don't think it fits a First amendment theory or there's

13 sufficient evidence on that issue.

14         With respect to the Fourth amendment claim against

15 Mr. Christian, it is our view that on the -- under the totality

16 of circumstances it was objectively reasonable for him to have

17 deployed the single PepperBall in an area saturation method to

18 encourage Ms. Epps to get out of 14th Avenue where she was

19 obstructing traffic.  We think that it's simply not a Fourth

20 amendment violation.

21         In addition, Your Honor, we would renew the

22 articulation of qualified immunity.  I understand the Court has

23 ruled against us with respect to the clearly established prong

24 of the qualified immunity analysis, but we would just renew that

25 argument to preserve that issue for purposes of the record.

**ATTACHMENT C**

1      And then the last issue with respect to Mr. Christian

2  is Ms. Epps has asserted a claim for punitive damages against

3  Mr. Christian, and on these facts, it is our position that under

4  the *Smith versus Wade* standard from the Supreme Court in 1983,

5  that there isn't sufficient evidence that a reasonable jury

6  could find that Mr. Christian's actions meet the extremely high

7  threshold for punitive damages under federal law.

8      There isn't any evidence that he acted with an evil

9  motive, and there isn't any evidence that he acted in reckless

10 disregard for Ms. Epps' federally protected rights.  What we

11 have here is one single shot of a PepperBall.  If it was a full

12 cartridge of PepperBalls, maybe it could support punitive

13 damages, but in this instance, it is our position that no

14 reasonable jury could conclude that punitive damages are

15 appropriate, and it doesn't meet the threshold for punitive

16 damages as a matter of law.

17     Do you want me to go on to the municipal liability

18 issues?

19         THE COURT:  Yes.

20         MR. RINGEL:  Thank you, Your Honor.  Also, I am going

21 to move for judgment as a matter of law on the issue of

22 municipal liability with respect to Denver.  And as the Court

23 understands and has been briefed, there are essentially five

24 different ways that a plaintiff can establish municipal

25 liability against Denver.

**ATTACHMENT C**

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1    matter whether it hit her or not, because it did affect her.

2         THE COURT:  It matters a lot if it affects the

3    credibility of your case.  I am going to deny the motion on

4    Epps, and in doing so, I am giving them a gift.  I think you're

5    making an advocacy mistake.  I have told you that before.  I

6    tell you that again now, but if you're willing to have the

7    credibility of your whole case affected by that argument on

8    Epps, I can't help you.

9         MS. STERK:  I understand, Your Honor.

10        THE COURT:  All right.  Let's hear the response on all

11   the rest of it, briefly.

12        MS. WANG:  Judge, we -- as with the other attorneys,

13   we incorporate our responses to the motion for summary judgment,

14   but I will specifically address some of the things that

15   Mr. Ringel asked, unless you have some specific questions you

16   would like me to target my argument to.

17        THE COURT:  No.  It is totally not helpful to the

18   Court for any of the three of you to incorporate all your prior

19   briefs and motions.

20        MS. WANG:  Okay.  Great.  So, with respect to

21   municipal liability, so we've heard a lot from Mr. Ringel in his

22   questioning of the experts and other witnesses about, you know,

23   whether or not Denver's official policies on BWC, meaning not

24   requiring officers to turn on or activate their body-worn

25   cameras during protests and not requiring officers to complete

**ATTACHMENT C**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 1:20-cv-01878-RBJ
*Consolidated with 1:20-cv-01922-RBJ-MEH*

ELISABETH EPPS,
ASHLEE WEDGEWORTH,
AMANDA BLASINGAME,
MAYA ROTHLEIN,
ZACH PACKARD,
HOLLIS LYMAN,
CIDNEY FISK,
STANFORD SMITH,
SARA FITOURI,
JACQUELYN PARKINS,
KELSEY TAYLOR,
YOUSSEF AMGHAR,
JOE DERAS,
JOHNATHAEN DURAN,
MICHAEL ACKER and
CLAIRE SANNIER,

       Plaintiffs,

v.

CITY AND COUNTY OF DENVER,
DANIEL FELKINS,
DAVID ABEYTA,
CITY OF AURORA,
CORY BUDAJ,
BOARD OF COUNTY COMMISIONERS FOR JEFFERSON COUNTY, COLORADO,
JONATHAN CHRISTIAN,
KEITH VALENTINE,
DAVID MCNAMEE,
PATRICIO SERRANT,
MATTHEW BRUKBACHER,
J. LNU,
JOHN AND JANE DOES 1-100, and
JOHN AND JANE BOES 1-50,

       Defendants.

# ATTACHMENT D

ORDER ON THE MOTIONS FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, OR
REMITTITUR AS TO DEFENDANTS DENVER AND JONATHAN CHRISTIAN

This matter is before the Court on Denver and Jonathan Christian's motions for judgment
as a matter of law, new trial, and remittitur (ECF Nos. 373, 374). For the reasons discussed
below, Denver's motion is DENIED. Mr. Christian's motion is GRANTED IN PART and
DENIED IN PART.

## I. BACKGROUND

This case is a consolidation of claims arising from police-protestor interactions during
demonstrations following George Floyd's murder. It was tried to a jury from March 7 through
March 25, 2022. The jury returned a verdict in favor of the plaintiffs on almost every claim. The
jury found Denver liable for violating Ms. Wedgeworth's First Amendment rights and awarded her
$750,000 in compensatory damages. ECF No. 343 at 6. The jury found Denver liable for violating
all the other plaintiffs' First and Fourth Amendment rights. *See* ECF No. 343. It awarded each of
these plaintiffs, other than Mr. Packard, $1 million in compensatory damages. *Id*. It awarded Mr.
Packard $3 million in compensatory damages. *Id*. at 3. Mr. Packard and Mr. Deras suffered injuries
because of the actions of Aurora officers, who came to aid Denver's protest response as mutual aid
officers. The jury found that Denver was liable for the actions of these mutual aid officers. *Id*. at 3,
5. Ms. Epps brought a claim against individual defendant Jonathan Christian, in addition to her
claims against Denver. The jury found that Mr. Christian had violated Ms. Epps Fourth Amendment
rights and awarded the $1 million in compensatory damages against Denver and Mr. Christian. *Id*. at
8. In addition, the jury awarded Ms. Epps $250,000 in punitive damages against Mr. Christian.

**ATTACHMENT D**

## II.   JUDGMENT AS A MATTER OF LAW OR NEW TRIAL

### A.   <u>Standard of Review</u>

1. <u>Judgment as a Matter of Law (JMOL)</u>

"A party is entitled to JMOL only if the court concludes that all of the evidence in the record reveals no legally sufficient evidentiary basis for a claim under the controlling law." *ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 771 (10th Cir. 2011) (brackets and ellipsis omitted). All reasonable inferences should be drawn in favor of the nonmoving party. *See id.* at 772. Judgment as a matter of law is not warranted unless all evidence points in one direction, and the evidence is not susceptible to any reasonable inferences supporting the nonmoving party's position. *Id.* "The question is not whether there is literally no evidence supporting the [nonmoving] party . . . but whether there is evidence upon which the jury could properly find [for that party]." *Century 21 Real Est. Corp. v. Meraj Int'l Inv. Corp.*, 315 F.3d 1271, 1278 (10th Cir. 2003). At bottom, the question in determining whether a motion for judgment as a matter of law should be granted is "whether there is any [evidence] upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

Federal Rule of Civil Procedure 50(a)(2) requires a party to make any motion challenging the sufficiency of the evidence prior to the case being submitted to the jury. *See Mountain Dudes v. Split Rock Holdings, Inc.*, 946 F.3d 1122, 1130–31 (10th Cir. 2019). The moving party must "specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." Fed. R. Civ. P. 50(a)(2). A party can renew its motion for judgment as a matter of law under Rule 50(b) after the jury returns a verdict. Fed. R. Civ. P. 50(b). A Rule 50(b) movant, however, can only reassert the same grounds for judgment as a matter of law

**ATTACHMENT D**

that he first asserted in his pre-deliberation Rule 50(a) motion. *Mountain Dudes*, 946 F.3d at 1131.

    2.  <u>New Trial</u>

Under Federal Rule of Civil Procedure 59, a court may grant a new trial after a jury trial, "for any reason for which a new trial has heretofore been granted in an action at law in federal court." A new trial may be granted if prejudicial error has occurred or if the verdict is against the weight of the evidence. *Anderson v. Phillips Petroleum Co*., 861 F.2d 631, 637 (10th Cir.1988). A new trial may also be granted if damages are excessive. See *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). "A motion for new trial on the grounds that the jury verdict is against the weight of the evidence normally involves a review of the facts presented at trial, and thus involves the discretion of the court." *Black v. Hieb's Enter., Inc.*, 805 F.2d 360, 363 (10th Cir.1986). The Court must grant a new trial if it determines that excessiveness in the amount of the award gives rise to the inescapable inference that it resulted from passion or prejudice on the part of the jury, since the prejudice may have infected the jury's liability determination as well. *See Malandris v. Merrill Lynch*, 703 F.2d 1152, 1168 (10th Cir.1981).

**B.  <u>Analysis of Denver's Motion for Judgment as a Matter of Law</u>**

Denver seeks judgment as a matter of law or a new trial because it believes the jury's verdict was not supported by the evidence in this case. As an initial matter, plaintiffs pursued three theories of liability against Denver: (1) policy, custom, or practice, (2) failure to train, and (3) ratification. Any of these theories on their own would be sufficient to support liability against Denver, and the jury found Denver liable for each plaintiff's injuries under all three theories.

**ATTACHMENT D**

1.     <u>Denver is Not Entitled to a Judgment as a Matter of Law or a New Trial on Plaintiffs'
Claims Under an Official Policy, Practice, or Custom Theory</u>

First, Denver argues that there was no evidence of a direct causal link between any

municipal policy and plaintiffs' injuries.  It argues that "a municipal policy must be the moving

force behind the constitutional violation."  ECF No. 373 at 2 (quoting *Bd. of Cnty. Comm'rs of*

*Bryan Cty., Okla. v. Brown,* 520 U.S. 397 (1997)).  It says there was no evidence that, "[f]or

example, with respect to Mr. Christian's use of PepperBall in the direction of Ms. Epps . . . Mr.

Christian specifically acted pursuant to an unconstitutional formal policy or an informal custom,

he was a final policymaker for Denver, any final policymaker specifically ratified Mr.

Christian's actions, or there was a specific known deficiency in Denver's training concerning

PepperBall use."  *Id*.  Denver argues that the same logic applies to all plaintiffs; there was no

evidence that a municipal policy was the moving force behind constitutional violations.

Plaintiffs respond that significant evidence was presented on causation.

I agree with plaintiffs.  There was evidence presented that the officers who violated

plaintiffs' constitutional rights acted pursuant to an unconstitutional policy.  The evidence

supported a conclusion that Denver Police Department (DPD) policy gave command officers

virtually limitless discretion to authorize officers to use less-lethal weapons in protest situations.[1]

ECF No. 350 at 1202–04.  In addition to the mountain of video evidence from which a

reasonable jury could have inferred this policy's existence, Commander Phelan testified that he

did not see any police actions during the protests that did not fall within DPD policy.  *See* ECF

No. 350 at 44.  There was also evidence that the use of less-lethal weapons resulted in harm to

protesters, including plaintiffs.  *See e.g.,* ECF No. 387 at 90–91 (Sannier), 153–55 (Smith), 195

---

[1] This order is based on my recollections of the testimony and evidence presented at trial, as well as a
review of the certified transcript.

**ATTACHMENT D**

(Packard); ECF No. 389 at 156 (Fitouri); ECF No. 390 at 10–11 (Rothlein), 62–63 (Blasingame); ECF No. 349 at 10–11 (Deras); ECF No. 351 at 160–62 (Taylor), 223 (Wedgeworth); ECF No. 352 at 1666 (Parkins), 191–93 (Epps); ECF No. 354 at 74 (Lyman).

As I said in ruling on the initial motion for judgment as a matter of law made at the close of plaintiffs' evidence, on the issue of causation, "the overreaction of the cops, the excessive application of PepperBalls and tear gas and sometimes some of the other projectiles . . . if you construe in favor of the plaintiff, which I have to do, was what led to the exposure of the plaintiffs to PepperBalls and tear gas, notwithstanding their peaceful protesting." ECF No. 344 at 31–32. As in the Rule 50(a) order, I must construe everything in favor of the plaintiffs in this order. A reasonable jury could find, and this jury did find, that Denver caused plaintiffs' specific injuries. As the jury's finding on causation was supported by evidence, Denver's motion for judgment as a matter of law or a new trial is denied on the issue of causation.

Second, Denver complains that plaintiffs failed to specify "precisely what formal policy of Denver violated any of their constitutional rights" and how such a formal policy violated their rights. ECF No. 373 at 3. Plaintiffs respond that evidence was presented regarding "Denver's official policies" of not requiring officers to activate body-worn cameras (BWCs), not requiring officers to timely complete use of force reports for protests, allowing "unlimited discretion to officers to use less lethal weapons as they saw fit," and allowing the use of 12-guage shotguns, flashbangs, and other explosives, and kettling. ECF No. 392 at 2–4.

Denver insists in its reply that plaintiffs have "failed to respond" to its argument that plaintiffs never specified any formal Denver policy violative of their constitutional rights. ECF No. 406 at 2. I disagree. Plaintiffs, in their presentation of evidence, specified several policies that caused violations of their First and Fourth Amendment rights and reiterated those policies in

**ATTACHMENT D**

their response to the instant motion.  One policy emphasized by plaintiffs was Denver's policy of permitting mutual aid partners to proceed under their own use-of-force policies, rather than requiring that they follow Denver's use-of-force policy.  *See* ECF No. 350 at 13–15.  Another was Denver's policy to permit use of less-lethal weapons against protesters on a discretionary basis.  *See id*. at 44.  Plaintiffs made sufficiently specific articulations of the Denver policies to which they objected.  I outlined above the evidence that could lead a reasonable juror to conclude that these policies caused plaintiffs' injuries.  This argument does not warrant judgment as a matter of law or a new trial.

Third, Denver argues that plaintiffs could not have alleged a practice or custom because they only introduced evidence from the first six days of the George Floyd protests.  ECF No. 373 at 3–4.  It cites *Carney v. City and Cty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) for the proposition that "[i]n order to establish a custom, the actions of the municipal employees must be 'continuing, persistent and widespread." *Id*. (internal quotations omitted).  Denver concludes that no practice or custom could have been established over such a short period.  Plaintiffs respond that they "did *not* need to show that there was a history of problems relating to use of force reporting, BWC camera use at protests, or any of the official policies" because as an official policy, practice, or custom requires either a showing of deliberate action by policymakers or that the practice or custom is a "standard operating procedure." ECF No. 392 at 3–4.  Denver asserted in its reply that plaintiffs did not respond to this argument.

Once again, I disagree with Denver.  I need not reach Denver's arguments about its customs or practices because a reasonable juror could have found that certain *policies* of Denver caused plaintiffs' injuries.  As plaintiffs would be entitled to recover if they showed a policy, practice, *or* custom of Denver's caused their injuries, it does not matter whether the six-day

7

**ATTACHMENT D**

period at issue would be sufficient to establish a custom or practice—there was sufficient evidence to support that Denver had a policy that caused the constitutional violations, which is enough to support the jury's verdict.  The evidence about Denver's policies would, however, also be powerful evidence of identical practices or customs.

Fourth, Denver argues that there is no evidence to support liability against it on plaintiffs' "policy, practice, or custom" theory because the final policymaker relied on by plaintiffs, Commander Phelan, has not been shown to have "personally participated in the specific events involving each plaintiff."  ECF No. 373 at 4.  Denver posits that Commander Phelan's orders as a final policymaker cannot be causally linked to the injuries suffered by plaintiffs.  Plaintiffs respond that because Commander Phelan authorized use of chemical munitions each day, authorized the use of less-lethal weapons to move protestors and ordered commanders to use less-lethal weapons against protestors, each of these decisions directly resulted in injuries to the plaintiffs.  ECF No. 392 at 4.  Plaintiffs also identify several incidents where plaintiffs were injured, and Commander Phelan authorized use of force.  *Id.*

Denver claims that the even if Commander Phelan was a final policymaker for the specific incidents cited, there remains no evidence of his participation as the final policymaker in the remaining incidents.  I must reject this argument because most of the policies identified by plaintiffs were orders of Commander Phelan.  A reasonable juror could find a causal link between the actions of Commander Phelan and the injuries suffered by plaintiffs on the evidence presented at trial.  Every plaintiff was injured by the inhalation of CS gas (2-chlorobenzylidene malononitrile, commonly called tear gas) from less lethal weaponry.  *See* ECF No. 387 at 90–91 (Sannier), 153–55 (Smith), 159-60 (Packard); ECF No. 389 at 156 (Fitouri); ECF No. 390 at 10–11 (Rothlein), 62–63 (Blasingame); ECF No. 349 at 10–11 (Deras); ECF No. 351 at 160–62

**ATTACHMENT D**

(Taylor), 223 (Wedgeworth); ECF No. 352 at 1666 (Parkins), 191–93 (Epps); ECF No. 354 at 74 (Lyman).  Commander Phelan authorized use of chemical munitions at each daily supervisor briefing during the six-day period at issue.  ECF No. 350 at 21.

The jury was instructed that "[o]fficial policy for Denver includes any actions Commander Phelan took or instructed others to take during the protests."  ECF No. 340 at 20.  In light of those two facts and that instruction, there is sufficient evidence to conclude that Commander Phelan's orders caused plaintiffs' injuries.  But for his authorization of the use of CS gas, plaintiffs would not have been injured by the inhalation and interaction with CS gas.  There is additional evidence linking Commander Phelan's actions to specific injuries sustained by plaintiffs, but the authorization of chemical munitions alone is sufficient for a reasonable juror to conclude that some of plaintiffs' injuries were caused by Commander Phelan's actions as policies of Denver.

Denver also argues that there is insufficient evidence to support the jury's finding of liability under the "ratification" and "failure to train" theories.  However, as I found above that there was sufficient evidence on the "policy, practice, or custom" theory to support the jury's finding of liability, I need not determine whether there was sufficient evidence to support these other theories.  For judgment as a matter of law to be warranted, Denver would have had to show that *no* theory of liability supported the jury's verdict.  As it has not done so, I will not address the remaining theories.

2.   Denver is Not Entitled a Judgment as a Matter of Law or a New Trial on the Mutual Aid Officer Issue

Denver next argues that "there is no legal support for the proposition one municipality can be held liable under a municipal liability theory for the actions of an officer of another municipality pursuant to 42 U.S.C. § 1983."  ECF No. 373 at 6.  It also argues that even if this

9

**ATTACHMENT D**

were a viable legal theory, it was not supported by sufficient evidence.  *Id.*  Plaintiffs respond

that there was "extensive evidence" to support the jury's finding on this point, including

evidence of Denver's policy to "allow mutual aid agencies to use their own policies and

weapons," evidence that the mutual aid agencies "operated under Phelan's direction," and

evidence that a DPD supervisor was embedded with each mutual aid unit and "provided direction

on how to deploy weapons through communications with the Command Post."  ECF No. 392 at

7.

This issue was hashed out at length during the jury instruction conference.  ECF No. 357

at 222–233.  At that time, the Court and the parties discussed the best way to ensure that the jury

would understand that they could only hold Denver liable for acts committed by officers from

other jurisdictions if they found that those mutual aid officers were acting pursuant to a policy,

practice, or custom of *Denver*.  There is a great deal of law supporting the proposition that a

municipality can be liable for officers' actions that violate citizens' rights committed pursuant to

an official policy, practice, or custom of the municipality.  *See e.g., City of Canton, Ohio v.*

*Harris*, 489 U.S. 378, 385 (1989).  That is exactly what the jury was instructed.  *See* ECF No.

340 at 24.  Denver cannot escape liability for officers who acted pursuant to its policies simply

because those officers were not Denver officers—liability attaches because it was Denver's

policy that caused the injury, not based on whether offending officers were on Denver's payroll.

Additionally, I find the evidence presented sufficient to support the jury's verdict that

Denver was liable for the injuries caused by mutual aid officers.  Commander Phelan testified

that officers from mutual aid agencies were under his direction during the George Floyd protests.

ECF No. 350 at 12–13.  He also testified that Denver's policy was to allow mutual aid officers to

follow the policies of their home jurisdictions and use weapons authorized for use in their home

10

**ATTACHMENT D**

jurisdictions.  *Id*. at 13–14.  Mr. Packard and Mr. Deras were hit with munitions from 12-guage shotguns shot by members of the Aurora police department.  ECF No. 387 at 195.  The DPD did not use these weapons.  ECF No. 350 at 15.  But for Denver's policy of permitting mutual aid agencies to follow their own use-of-force policies and use their own weapons, Mr. Packard and Mr. Deras could not have suffered the injuries that they did.  This evidence supports the jury's finding that Denver's policy of permitting mutual aid partners to use their own less-lethal weapons caused at least some of the injuries inflicted on plaintiffs.  Judgment as a matter of law is not warranted on this issue.

       3.   <u>Admission of Testimony of Nicholas Mitchell Does Not Warrant a New Trial</u>

Mr. Mitchell was the independent monitor in Denver during the time of the protests.  His office conducted a review of the actions of the DPD at the George Floyd protests and produced a report with its findings.  Denver argues that Mr. Mitchell's testimony should have been inadmissible for two reasons.  First, it argues that his testimony regarding the Office of Independent Monitor's (OIM) report was evidence of subsequent remedial measures and thus inadmissible under FRE 407.  ECF No. 373 at 7.  Second, it argues Mr. Mitchell's testimony was inadmissible because Mr. Mitchell had no personal knowledge of anything that occurred at the protests, and he was not endorsed as an expert witness.  *Id*. at 7–8.  Finally, they argue that any probative value of Mr. Mitchell's testimony was far outweighed by the prejudice to Denver.  *Id*. at 8.  Plaintiffs respond that because these evidentiary issues with Mr. Mitchell's testimony were not raised in Denver's Rule 50(a) motion, they cannot be raised in Denver's Rule 50(b) motion.  ECF No. 392 at 7–8.  Rather, plaintiffs argue, this alleged error can only be considered under the Rule 59(a), where the grant of a new trial is appropriate "only where an error that led to a verdict that is 'clearly, decidedly or overwhelmingly against the weight of the evidence.'"  *Id*. at 8

**ATTACHMENT D**

(quoting *Elm Ridge Expl. Co., LLC v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013)).  Denver did not respond to this argument in its reply and instead reiterates the argument it made in its original motion.  ECF No. 406 at 4.

I agree with plaintiffs that Denver did not raise this issue in its Rule 50(a) motion.  Even if I were to assume for this purpose that the admission of Mr. Mitchell's testimony was an error, to find that a new trial is warranted I would have to find that the admission of Mr. Mitchell's testimony led to a verdict decidedly against the evidence.  *See Anderson*, 861 F.2d at 637.  I cannot make such a finding.  There was substantial evidence supporting the verdict, including the testimony of plaintiffs, plaintiffs' expert witnesses, Commander Phelan, and numerous videos and pictures.  As I discussed at length above, the jury's verdict was not contrary to the weight of the evidence.  A new trial is not warranted due to the admission of Mr. Mitchell's testimony (which in any event I believe to have been proper).

### 4.  Admission of OIM Memos Does Not Warrant a New Trial

The memos objected to in this section were created by the OIM in its process of reviewing DPD actions at the George Floyd protests.  Denver argues that the admission of the OIM memos was improper for three reasons.  First, it argues the OIM memos contain evidence of subsequent remedial measures, which are inadmissible under Federal Rule of Evidence 407.  ECF No. 373 at 8.  Second, it argues that the memos were hearsay that did not fall within any exception because the OIM did not have an agency relationship with Denver.  *Id*.  Third, it argues that any probative value of the OIM memos was substantially outweighed by the prejudice to Denver.  *Id*.  Plaintiffs respond first that Denver did not raise this issue in its Rule 50(a) motion, and so it can only proceed on a new trial motion with this issue and not under its renewed judgment as a matter of law motion, and second, that the officers interviewed by the

**ATTACHMENT D**

OIM were agents of Denver because they were employees acting within the scope of their responsibilities.  ECF No. 392 at 9.  Denver does not respond to plaintiffs' argument that this issue was not raised in its Rule 50(a) motion.

I agree with plaintiffs that Denver did not raise the admissibility of the OIM memos in its Rule 50(a) motion.  A new trial is not warranted on this issue.  Even assuming it was error to admit the OIM memos, I cannot find that their admission led to a verdict decidedly against the weight of the evidence.  Moreover, the Court went through these memos carefully and in detail before trial and redacted information that it found to be protected by a privilege, including the law enforcement privilege.

### 5.   Plaintiff Counsel's Misconduct Does not Warrant a New Trial

Next, Denver argues that Ms. Wang's (the Fitouri plaintiff counsel) reference to comments made by Derek Chauvin's lawyer during her examination of Officer Cunningham warrants a new trial.  ECF No. 373 at 9.  Plaintiffs respond that counsel's comment was not inappropriate, and even if it was, does not warrant a new trial.  Ms. Wang asked Officer Cunningham, "[w]ould you agree that there's a limitation to cameras, that the camera only sees what the camera sees?"  ECF No. 357 at 119.  After Officer Cunningham responded in the affirmative, Ms. Wang asked, "[a]re you aware that the person who said that led Derek Chauvin's defense in his trial for the murder of George Floyd?"  *Id*.  The defense objected and that objection was immediately sustained.  *Id*.

A judgment will not be disturbed for inappropriate remarks "unless it clearly appears that the challenged remarks influenced the verdict."  *Burke v. Regalado*, 935 F.3d 960, 1026 (10th Cir. 2019).  In deciding whether the jury was influenced by a remark, courts consider the extent of the remark, whether it can be cured through jury instruction, and whether the remark had a

**ATTACHMENT D**

prejudicial effect." *Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1169 (10th Cir. 2017).

This Court made extremely clear that Ms. Wang's reference to the Chauvin trial was inappropriate.  ECF No. 357 at 119–21.  The Court immediately sustained Denver's objection to that question.  *Id.* at 119.  However, the remark was not extensive.  It consisted of one question. *Id.*  And within minutes, the Court issued a curative jury instruction.  It stated:

> Ladies and gentlemen, you probably could tell from the tone of my sustaining that last objection that I was not amused.  There is no basis whatsoever for counsel to have asked a question that suggests a comparison of what happened in Denver to what happened in the Chauvin case in Minnesota.  Please don't be prejudiced by that in any way.  This case stands on its own evidence, its own facts, and I don't want any counsel to be suggesting something different than that to you.

*Id.* at 121.

Denver argues that counsel's statement was not remedied by instruction because counsel's question equated all police officers with Mr. Chauvin would inflame the passions of the jury in a way that could not be remedied.  ECF No 373 at 10.  However, jurors are presumed to follow instructions, and there is no reason to believe that any prejudice Denver suffered could not be cured by this instruction or that it was not cured by this instruction.  *See CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 341 (2009).

### C.  Analysis of Mr. Christian's Motion for Judgment as a Matter of Law and for a New Trial

Mr. Christian first argues that there was not sufficient evidence to support the jury's verdict against Mr. Christian because all the evidence indicated that his action in shooting a PepperBall at Ms. Epps as she crossed the street was objectively reasonable.  ECF No. 374 at 4. He therefore requests judgment as a matter of law or a new trial.  Second, he argues that he was entitled to qualified immunity because Ms. Epps did not sufficiently define which of her constitutional rights were violated by Mr. Christian's actions.  *Id.* at 4–5.  Third, he argues that

14

**ATTACHMENT D**

he was entitled to judgment as a matter of law on the question of punitive damages because plaintiffs presented no evidence of the reckless or callous intent required to support a punitive damage award.  *Id*. at 5.  Fourth, Mr. Christian argues that he was prejudiced by the Court's denial of his motion for bifurcation and is entitled to a new trial because of that prejudice.  *Id*. at 6.  I will proceed through these arguments in turn.

   1.   Sufficiency of the Evidence

Mr. Christian first argues that judgment as a matter of law or a new trial is warranted because all the evidence indicated that his shooting a PepperBall at Ms. Epps was objectively reasonable.  ECF No. 374 at 4.  Ms. Epps responds that there was video of the incident showing that as Ms. Epps peacefully crossed the street, Mr. Christian, got on one knee and shot at her, and was subsequently told by another officer not to shoot at her anymore.  ECF No. 391 at 2.

As Mr. Christian stated in his motion, "[w]hether Mr. Christian's use of force against Ms. Epps violated the Fourth Amendment turns on whether his actions were objectively reasonable and requires a totality of the circumstances analysis considering the severity of the crime at issue, whether Ms. Epps posed an immediate threat to the safety of the officers or others, and whether Ms. Epps was actively resisting or attempting to evade arrest by flight."  ECF No. 374 at 4 (citing *Graham v. Connor,* 490 U.S. 386, 396 (1989); *Simpson v. Little,* 16 F.4th 1353, 1360-61 (10th Cir. 2021)).  Based on those considerations, I find that the weight of the evidence is sufficient to support to jury's finding in favor of Ms. Epps.  Ms. Epps' crime was not severe; she was, at most, jaywalking.  There was no evidence that she posed an immediate threat to anyone other than the fact that she was crossing the street at night and not at the crosswalk.  Mr. Christian argues that he "reasonably perceived Ms. Epps posed a danger to herself and the public in the traveling vehicles."  ECF No. 374 at 4.  However, whether Mr. Christian's perception of Ms. Epps as a threat was *reasonable* was a question of fact for the jury, not an issue that can be

15

**ATTACHMENT D**

determined by a conclusory statement by Mr. Christian in a motion.  Further, there was no evidence that she was fleeing or actively resisting the officers.  There is sufficient evidence to support the jury's conclusion that Mr. Christian's actions were not objectively reasonable— neither judgment as a matter of law nor a new trial is appropriate.

    2.  <u>Qualified Immunity</u>

Second, Mr. Christian argues that he was entitled to qualified immunity because Ms. Epps did not sufficiently define which of her constitutional rights were violated by Mr. Christian's actions.  ECF No. 374 at 4–5.  He argues that the two cases most relied on in the Court's order on Mr. Christian's motion for summary judgment likewise did not identify the constitutional right violated with sufficient specificity.  *Id*. at 5.  Ms. Epps responds that the right violated was sufficiently defined in those cases, and that those cases are analogous to this case— those cases "involved Fourth Amendment claims for the use of force, including the use of PepperBalls, on peaceful protestors."  ECF No. 391 at 3.

I agree with plaintiffs for largely the same reasons I identified in my order on Denver's motion for summary judgment.  *See* ECF No. 304 at 15–16.  In *Buck v. City of Albuquerque*, 549 F.3d 1269, 1290 (10th Cir. 2008), plaintiffs engaging in peaceful protest were subjected to tear gas and PepperBall shots.  Ms. Epps behavior was even less likely than the plaintiffs in *Buck* to cause any danger from others.  While some plaintiffs in *Buck* remained in the street to obstruct traffic, Ms. Epps was in the process of crossing the street when Mr. Christian shot at her, with no indication that she was going to stop in the street or was attempting to obstruct traffic.  *See id*.; ECF No. 352 at 199.  The illegality of actions like Mr. Christian's have been specifically outlined in past Tenth Circuit cases, and he is not entitled to judgment as a matter of law or a new trial on this issue.

**ATTACHMENT D**

3. Punitive Damages

Third, Mr. Christian argues that he was entitled to judgment as a matter of law on the question of punitive damages because plaintiffs presented no evidence of the reckless or callous intent required to support punitive damages. *Id*. at 5. Ms. Epps responds that there was evidence of Mr. Christian's reckless or callous intent: the videos that show him shooting at Ms. Epps and Ms. Epps' testimony recounting what she saw when Mr. Christian shot at her. Mr. Christian argues that the only evidence regarding his intent is his own testimony. ECF No. 374 at 5–6. However, intent can be inferred from a variety of evidence, including video evidence and the testimony of others, both of which Ms. Epps presented. I cannot agree with Mr. Christian that there is no evidence to support the jury's finding that he acted with a reckless or callous intent.

Mr. Christian also argues that there is no evidence that Mr. Christian "perceived" the risk that his actions would violate Ms. Epps' constitutional rights. He cited *Eisenhour v. Cnty.*, 897 F.3d 1272, 1281 (10th Cir. 2018) for the proposition that "'reckless or callous indifference' requires that the defendant have acted 'in the face of a perceived risk that its actions will violate federal law.'" *Id*. (quoting *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 536 (1999)). However, upon a review of that case, it seems that the perception requirement is another way of requiring that the law be clearly established. The *Eisenhour* Court explained the perception requirement by stating that, in the employment discrimination context, even where there has been intentional discrimination, there may not be liability because "the underlying theory of discrimination may be novel or otherwise poorly recognized, or an employer may reasonably believe that its discrimination satisfies a bona fide occupational qualification defense or other statutory exception to liability." *Id*. (quoting *Kolstad*, 527 U.S. at 536–37). As I explained in the order on Mr. Christian's motion for summary judgment and above, the law was sufficiently

**ATTACHMENT D**

established for liability, and Mr. Christian's hair-splitting legal argument on the perception

requirement does not persuade me otherwise.

    4.  <u>Bifurcation</u>

Fourth, Mr. Christian argues that he was prejudiced by the Court's denial of his motion

for bifurcation.  ECF No. 374 at 6.  Specifically, he claims that "the steady parade of video

evidence involving other Denver police officers and other people and the allegations those

actions were caused by failures by Denver itself were profoundly prejudicial to Mr. Christian."

*Id*.  Mr. Christian also argues that he should not have been made to proceed with Denver under

*Tanburg v. Sholtis,* 401 F.3d 1151 (10th Cir. 2005), which stands for the proposition that

evidence showing that an officer did not comply with department policy cannot be introduced to

show that the officer violated a plaintiff's constitutional rights.

Ms. Epps responds that the jury did not just lump Mr. Christian in with Denver—it found

Denver liable for violating Ms. Epps' Fourth and First Amendment rights but found Mr.

Christian liable only for violation of Ms. Epps' Fourth Amendment rights.  She also argues that

evidence of Denver's policies and training was not prejudicial to Mr. Christian because the jury

was instructed specifically on that issue.  Instruction 10 stated, "[a]s you consider those

instructions, you must bear in mind that in order for the plaintiffs to prove a constitutional

violation, it is not enough to show that an officer violated a policy, regulation, rule, training, or

practice."  ECF No. 340 at 12.  On the *Tanburg* issue, Ms. Epps responds that as plaintiffs did

not argue or seek to argue that Mr. Christian's actions in shooting Ms. Epps were outside of

Denver policy, *Tanburg* was inapplicable.

I agree with Ms. Epps on the *Tanburg* issue.  Ms. Epps never argued that Mr. Christian's

actions were outside of policy—she argued to the contrary, that Mr. Christian's actions were

**ATTACHMENT D**

exactly in line with Denver's use-of-force policy, a policy that she and her co-plaintiffs argued was far too discretionary. *Tanburg* is not a consideration that would require the Court to bifurcate Ms. Epps' case against Mr. Christian, and it is not a reason that Mr. Christian would be entitled to judgment as a matter of law or a new trial.

I also agree with Ms. Epps that the denial of Mr. Christian's request to bifurcate did not unfairly prejudice the jury against him. There is no reason to believe that the jury did not follow the instruction "in order for the plaintiffs to prove a constitutional violation, it is not enough to show that an officer violated a policy, regulation, rule, training, or practice," especially because jurors are presumed to follow jury instructions. ECF No. 340 at 12. Further, the jury's determination that Mr. Christian violated Ms. Epps' Fourth Amendment but not her First Amendment rights shows that the jury did not simply lump Mr. Christian's actions in with Denver's—had they done so, they would have found Mr. Christian liable for First Amendment violations against Ms. Epps, as they found Denver was liable for First Amendment violations against Ms. Epps. *See* ECF No. 343 at 7–8. This jury was extremely diligent throughout this case. They asked thoughtful questions and engaged in a lengthy deliberation, and they were instructed to consider Mr. Christian's liability separately from Denver's. *See* ECF No. 340 at 13–17, 18–23. I presume that they followed those instructions, and Mr. Christian has presented no evidence that they did not, other than the fact of the award against him. As there is no reason to believe that, even if the failure to bifurcate was error, such an error was prejudicial to Mr. Christian, he is entitled to neither judgment as a matter of law nor a new trial.

## III.   REMITTITUR

### A.  <u>Standard of Review</u>

Remittitur is appropriate only when "the jury award is so excessive . . . as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or

**ATTACHMENT D**

another improper cause invaded the trial." *Murphy Oil USA, Inc. v. Wood*, 438 F.3d 1008, 1021

(10th Cir. 2006) (quotations omitted).  "The [] court may order a remittitur and alternatively

direct a new trial if the plaintiff refuses to accept the remittitur, a widely recognized remedy."

*Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 703 F.2d 1152, 1168 (10th Cir. 1981).

Courts evaluating emotional distress compensatory damages awards focus on the specific

testimony of the plaintiff, whether medical or other healthcare assistance was sought, and

corroborating objective evidence supporting the plaintiff's testimony.  *Smith v. Nw. Fin.*

*Acceptance, Inc.*, 129 F.3d 1408, 1416–17 (10th Cir. 1997).

### B.  <u>Denver's Request for Remittitur</u>

Denver argues that the damages awarded by the jury against Denver are so excessive that

they cannot be compensatory.  The jury awarded $1,000,000 per plaintiff, except for Ms.

Wedgeworth ($750,000) and Mr. Packard ($3,000,000).  Denver argues that the only reasonable

explanation of the jury award is that the award was based on "its determination Denver's overall

response to the protests was inappropriate and violative of people's constitutional rights

generally."  ECF No. 373 at 14.  It asks the court to order remitter to $100,000 per plaintiff

except Ms. Wedgeworth $75,000 and Mr. Packard $500,000.

Plaintiffs respond that they presented evidence of physical injuries for each plaintiff that

would be sufficient to support the jury's award in favor of each plaintiff against Denver.

However, they argue, even if the physical injuries were insufficient, the evidence of plaintiffs'

emotional damages would be more than sufficient to support the award.

Each plaintiff presented testimony that they suffered, at minimum, from the inhalation of

CS gas.  *See e.g.*, ECF No. 387 at 90–91 (Sannier), 153–55 (Smith), 195 (Packard); ECF No. 389

at 156 (Fitouri); ECF No. 390 at 10–11 (Rothlein), 62–63 (Blasingame); ECF No. 349 at 10–11

**ATTACHMENT D**

(Deras); ECF No. 351 at 160–62 (Taylor), 223 (Wedgeworth); ECF No. 352 at 1666 (Parkins),

191–93 (Epps); ECF No. 354 at 74 (Lyman).  Almost all testified that they were chased through

the streets, shot at or hit with PepperBalls or other less-lethal projectiles.  Denver is correct that,

other than Mr. Packard, none of the plaintiffs presented evidence that their physical injuries were

extensive.  However, physical damages are not the only damages suffered in this case.

Plaintiffs also testified at length regarding the emotional distress they suffered because of

the police actions they experienced at the protests.  Plaintiffs described the distress that they felt

at the time, and the distress that they felt in the days, weeks, and months that followed their

experiences at the protest.  Plaintiffs did not testify to seeking much, if any, medical attention for

their emotional distress, nor did any receive a diagnosis regarding their emotional distress.

However, measuring damages for emotional distress is not an exact science.  The jurors

observed the testimony of the plaintiffs regarding how their experiences at these protests affected

them.  The jurors, as judges of the facts, determined that the emotional distress suffered by the

plaintiffs was significant.  More than just the words that plaintiffs spoke, the jurors were able to

observe the demeanor of plaintiffs as they spoke about their distress.  And even without a

diagnosis or significant long-term symptoms of that distress, there was evidence in the form of

plaintiffs' testimony of significant distress suffered during the protests and in their immediate

aftermath.

Remittitur is an extreme remedy and one that this Court would not engage in without a

verdict that shocked the judicial conscience.  This is not such a verdict.  The plaintiffs testified

about the impact that their experiences at the hands of the police while they peacefully protested

had on them.  It is clear from the verdict that the jury believed that testimony and assessed

damages that they believed were warranted in light of that impact.  The Court might have

**ATTACHMENT D**

awarded less.  However, the jury is the conscience of the community.  This was an attentive and thoughtful jury, and I do not find that its decision was shocking or the result of passion, prejudice, or impropriety.  The police no doubt faced a very difficult situation, as there were individuals in the crowds who threw rocks, full water bottles, and other objects at officers throughout the protests.  However, Denver's stubborn instance that the police did nothing wrong in the face of overwhelming video evidence to the contrary, coupled with evidence that each plaintiff was peaceful but sustained injuries as a result of the misconduct, was sufficient to support the jurors' verdict.  The Court will not exercise its discretion to remit the awards against Denver.

### C.  Mr. Christian's Request for Remittitur

Mr. Christian argues that the punitive damages awarded against him are excessive, unfair, and in violation of the due process clause, and he requests that the Court remit the punitive damage award against him.  More specifically, Mr. Christian argues that as the jury did not order any compensatory damages against him, the punitive damages are extremely excessive, as many courts have held that punitive damages should be held around a 1:1 ratio with compensatory damages.  Ms. Epps responds that there was a compensatory award against Mr. Christian—after inquiring whether Denver was liable for the claims against it and whether Mr. Christian was liable for the claims against him, the verdict form asked the jurors only, "[w]hat amount of compensatory damages do you award to Elisabeth Epps?" and then "[w]hat amount of punitive damages do you award to Elisabeth Epps against Jonathan Christian?".  ECF No. 391 at 8–10 (quoting ECF No. 343 at 8).  The jury answered the compensatory damages question with an award of $1 million, not specifying which compensatory damages were against Denver and which were against Mr. Christian.

**ATTACHMENT D**

I agree with Ms. Epps that the jury did award compensatory damages against Mr. Christian, and that he is jointly and severally liable with Denver for the compensatory award in favor of Ms. Epps.  However, I agree with Mr. Christian that the punitive damages awarded against him are excessive.  Mr. Christian shot one PepperBall at Ms. Epps as she crossed the street.  He should not have done that, and the jury found that by doing so, he violated her Fourth Amendment rights.  However, the evidence was unclear as to whether the PepperBall hit her; at most, it caused a bruise.  Compared to the other injuries that Ms. Epps suffered during the protests, Mr. Christian's shooting caused minimal damage.  Ms. Epps was shot with PepperBalls and exposed to CS gas on numerous occasions, and from an objective standpoint, and considering those other shootings and exposures, Mr. Christian's actions do not warrant a punitive damage award of $250,000.

While I have immense respect and appreciation for the jury's work in deciding this case, the punitive damages as to Mr. Christian are excessive.  Using my discretion, I will remit the punitive damage award against Mr. Christian to $50,000.  I believe that would be a fair and not excessive punishment for the wrong he committed against Ms. Epps.  If Ms. Epps is unwilling to accept that amount, then I will grant a new trial as to her claims against Mr. Christian.

ORDER

1. Defendant the City and County of Denver's motion for judgment as a matter of law, or a new trial, or remittitur, ECF No. 373, is DENIED.

2. Defendant Jonathan Christian's motion for judgment as a mater of law, or a new trial, or remittitur, ECF No. 374, is GRANTED IN PART and DENIED IN PART.  It is granted to the extent that the Court orders that the punitive

**ATTACHMENT D**

damages award be remitted to $50,000; and if that is not accepted by plaintiff Epps, then the Court orders a new trial as to her claims against Mr. Christian.

DATED this 19th day of September, 2022.

BY THE COURT:

R. Brooke Jackson
United States District Judge

**ATTACHMENT D**